UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MIRAGE WINE + SPIRITS, INC., d/b/a MIRAGE WINE & SPIRITS, MARTLET MEADOWS FARM, LLC, d/b/a DOUBLE BUBBLE CAR WASH; PARCELLE LLC, d/b/a PARCELLE ORGANICS; FOGGY BOTTOMS BOYS, LLC; and FAMILIA COFFEE, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>      v.<br><br>APPLE INC., VISA INC., and MASTERCARD INCORPORATED,<br><br>                    Defendants. | Case No. 3:23-cv-3942-DWD<br><br>Hon. David W. Dugan |

**MEMORANDUM OF LAW
IN SUPPORT OF VISA'S AND MASTERCARD'S MOTION TO DISMISS**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT..................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 2

PROCEDURAL HISTORY ........................................................................................................ 5

LEGAL STANDARD ................................................................................................................ 6

ARGUMENT .............................................................................................................................. 7

    A.   No Direct Evidence of Conspiracy:  the Apple Pay Contracts Do Not Contain
         Any of the Alleged Restraints ........................................................................................... 9

    B.   No Circumstantial Evidence of Conspiracy:  the Amended Complaint's Other
         Factual Allegations Do Not Plausibly Support the Existence of an Unlawful
         Agreement ......................................................................................................................... 14

CONCLUSION.......................................................................................................................... 18

**<u>TABLE OF AUTHORITIES</u>**

**Cases**                                                                           **Page(s)**

*Always Towing & Recovery, Inc. v. City of Milwaukee,*
   2 F.4th 695 (7th Cir. 2021) ................................................................. 8, 9

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................... 6, 18

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties,*
   15 F.4th 831 (7th Cir. 2021) .......................................................... 6, 7, 14

*Bakay v. Apple,*
   2024 WL 3381034 (N.D. Cal. July 11, 2024) .......................................... 16

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................. 6, 14, 18

*Braman v. The CME Grp., Inc.,*
   149 F. Supp. 3d 874 (N.D. Ill. 2015)................................................... 9, 14

*Dream Big Media Inc. v. Alphabet Inc.,*
   2024 WL 3416509 (N.D. Cal. July 15, 2024) .......................................... 12

*Fed. Trade Comm'n v. Facebook, Inc.,*
   560 F. Supp. 3d 1 (D.D.C. 2021)........................................................11

*Forrest v. Universal Sav. Bank, F.A.,*
   507 F.3d 540 (7th Cir. 2007) ............................................................. 7

*In re Broiler Chicken Antitrust Litig.,*
   290 F.Supp.3d 772 (N.D. Ill. 2017)...................................................... 14

*In re Delta Dental Antitrust Litig.,*
   484 F. Supp. 3d 627 (N.D. Ill. 2020) ..................................................... 7

*In re German Auto. Manufacturers Antitrust Litig.,*
   612 F. Supp. 3d 967 (N.D. Cal. 2020), *aff'd*, 2021 WL 4958987
   (9th Cir. Oct. 26, 2021) ................................................................. 13

*In re Google Digital Advertising Antitrust Litigation,*
   627 F. Supp. 3d 346 (S.D.N.Y. 2022)................................................ 12, 15

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.,*
   630 F. Supp. 3d 968 (N.D. Ill. 2022)..................................................... 7

*In re Text Messaging Antitrust Litig.,*
   630 F.3d 622 (7th Cir. 2010) ............................................................ 14

*In re Turkey Antitrust Litig.,*
   642 F. Supp.3d 711 (N.D. Ill. 2022) ................................................ 12, 14

ii

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337 (S.D.N.Y. 2016) ......................................................................... 13

*Monsanto Co. v. Spray–Rite Serv. Corp.*,
465 U.S. 752 (1984) ......................................................................... 7, 8, 13, 15

*Omnicare, Inc. v. UnitedHealth Group, Inc.*,
629 F.3d 697 (7th Cir. 2011) ......................................................................... 8, 13

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) .........................................................................11

*Phillips v. Prudential Ins. Co. of America*,
714 F.3d 1017 (7th Cir. 2013) ......................................................................... 7

*Procaps S.A. v. Patheon, Inc.*,
845 F.3d 1072 (11th Cir. 2016) ......................................................................... 8, 9

*Quality Auto Body, Inc. v. Allstate Ins. Co.*,
660 F.2d 1195 (7th Cir. 1981) ......................................................................... 8, 9

*Riley v. Info. Sys. Audit & Control Ass'n, Inc.*,
2023 WL 3997075 (N.D. Ill. June 14, 2023) ......................................................................... 7

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
870 F.2d 397 (7th Cir. 1989) ......................................................................... 9, 14

*Scherr v. Marriott Int'l, Inc.*,
703 F.3d 1069 (7th Cir. 2013) ......................................................................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ......................................................................... 7

*Toscano v. Pro. Golfers Ass'n*,
258 F.3d 978 (9th Cir. 2001) ......................................................................... 9

*United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
390 F. Supp. 3d 892 (N.D. Ill. 2019) ......................................................................... 15

**Statutes**

15 U.S.C. § 1 ......................................................................... 7

**Rules**

Rule 12(b)(6) ......................................................................... 6

**Other Authorities**

AnnaMaria Andriotis, *Apple Pay Fees Vex Credit-Card Issuers*, Wall Street
Journal (Oct. 5, 2021), https://tinyurl.com/bdffwub7 ......................................................................... 4

Apple Press Release, *Developers can soon offer in-app NFC transactions
using the Secure Element* (Aug. 14, 2024), https://tinyurl.com/22brfebh. ......................................................................... 17

EC Press Release, *Antitrust: Commission Sends Statement of Objections to
Apple over Practices Regarding Apple Pay* (May 22, 2020),
https://tinyurl.com/4j5498z4. ......................................................................... 17

Defendants Visa Inc. ("Visa") and Mastercard Incorporated ("Mastercard") respectfully move this Court for an order dismissing with prejudice Plaintiffs' Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiffs' Sherman Act § 1 claim turns on contracts whose plain language belies Plaintiffs' allegations. Plaintiffs allege that, in connection with the launch and operation of Apple Pay, Defendant Apple, Inc. entered into four separate written agreements with four payment networks—Defendants Visa and Mastercard, and non-defendants American Express and Discover—and that these written agreements (the "Apple Pay Contracts") allegedly restrain trade in violation of Section 1 of the Sherman Act. But the Apple Pay Contracts referenced in Plaintiffs' pleading do not contain the alleged restraints, and Plaintiffs allege no other facts to support their theory.

Citing no contractual provision in support, Plaintiffs allege that the Apple Pay Contracts contain an agreement by Apple (1) not to compete with the four networks, (2) not to permit Apple Pay users to complete transactions using ACH or other direct bank-to-bank solutions, and (3) not to permit third-party app developers to access Apple's NFC hardware to facilitate payment transactions (the "Alleged Restraints"). Because Plaintiffs incorporate the Apple Pay Contracts by reference in their Amended Complaint—and indeed, rely on their existence to support their claim—this Court may review Defendants' contracts and see that they contain none of these Alleged Restraints.[1] To the contrary, the Apple Pay Contracts expressly preserve Apple's right to compete with Visa and Mastercard.

---

[1] *See* Ex. 1 (Payment Platform Agreement between Apple and Visa, dated Aug. 29, 2014) and Ex. 2 (Payment Platform Agreement between Apple and Mastercard, dated Aug. 11, 2014). ███████████ ████████████████████ and is in effect today. Ex. 1, § 10.1; Ex. 2, § 10.1; *see also* Am. Compl. ¶ 142.

Plaintiffs plead no circumstantial evidence—such as communications, meetings, or other facts—that would support an agreement beyond the Apple Pay Contracts. Plaintiffs allege that the networks agreed to pay transaction fees to Apple as a "cash bribe," but the Apple Pay Contracts show that the fees are paid not by the defendant networks, but by payment-card issuing banks that are not defendants. In any event, Plaintiffs plead no facts supporting an inference that these fees are anything other than ordinary compensation by issuers to Apple in exchange for Apple providing access to Apple's iPhone ecosystem.

Plaintiffs' claim that Defendants agreed to the Alleged Restraints is supported by nothing more than bald, conclusory assertions that are directly contradicted by the Apple Pay Contracts. The Amended Complaint should be dismissed.

## FACTUAL BACKGROUND

Plaintiffs are merchants that have chosen to allow their customers to use Apple Pay at their physical retail locations. Am. Compl. ¶¶ 13–17. Launched by Apple in 2014, Apple Pay is a mobile payment service that offers customers a way to store digital versions of their payment cards on iPhones and other Apple devices and to use them to make purchases at merchants that have chosen to accept Apple Pay. *See id.* ¶¶ 52–53. Visa and Mastercard each operate competing global payment card networks that enable credit and/or debit transactions initiated by cardholders to purchase goods and services from merchants. *See id.* ¶¶ 19–20. Visa and Mastercard each provide these services by connecting one set of financial institutions—those that issue the cards to cardholders (issuing banks)—with another set of financial institutions—those

---

Plaintiffs' assertion that each agreement has a "renewable three-year term," Am. Compl. ¶ 62, is incorrect. Visa and Mastercard do not have access to American Express's and Discover's separate, bilateral contracts with Apple to which Visa and Mastercard are not alleged to be parties. Whatever those contracts say cannot constitute an agreement in restraint of trade involving Visa or Mastercard.

that receive and process the payments on behalf of their merchant customers (acquiring banks). Visa and Mastercard do not themselves perform the functions of issuing or acquiring banks. *See id.* ¶¶ 27–29 (describing Visa and Mastercard as "four-party" networks). Visa and Mastercard, along with American Express and Discover, are among the payment-card networks whose branded payment cards can be used in Apple Pay. *See id.* ¶¶ 62–63.

Plaintiffs' sole claim for relief accuses Apple, Visa, Mastercard, American Express, and Discover of "enter[ing] into and engag[ing] in a conspiracy to allocate and divide the Relevant Market and not to compete in violation of Section 1 of the Sherman Act." *Id.* ¶ 150; *see id.* ¶¶ 111–112 (defining the Relevant Market as the U.S. market for "POS [point of sale] Payment Card Network Services," which is "the provision and acceptance of Payment Cards at the physical POS by Merchants as payment for goods and services"). "But for this market-allocation agreement," the Amended Complaint asserts, "Apple or a third party would have entered the Relevant Market," which in turn would have "plac[ed] downward pressure on the Entrenched Networks' fees in the Relevant Market" allegedly incurred by merchants for card acceptance. *Id.* ¶ 124.

Plaintiffs allege that the conspiracy emanates from separate contracts entered into between each of the four networks and Apple (namely, the Apple Pay Contracts). *Id.* ¶¶ 3, 57, 63. According to Plaintiffs, the alleged conspiracy reflected in the Apple Pay Contracts "had three principal components that worked together to restrain competition." *Id.* ¶ 57.

- "First, Apple agreed that it would not create its own payment system that would compete with Visa and Mastercard's respective payment systems." *Id.*

- "Second, Apple agreed to . . . prohibit consumers from using Apple Pay to transfer funds from their bank account directly to the Merchant's bank account," using "ACH or other direct bank-to-bank solutions." *Id.*

- "Third, Apple agreed not to allow other third-party payment Applications installed on Apple devices to reside in the Apple Wallet or use the NFC hardware on those devices to facilitate POS Transactions in the Relevant Market." *Id.*[2]

Plaintiffs allege that Apple agreed to these Alleged Restraints in the Apple Pay Contracts "in exchange for receiving transaction fees" on Apple Pay purchases, which Plaintiffs label an "ongoing cash bribe." *Id.* ¶¶ 58, 150. Although the Amended Complaint conclusorily asserts that those fees are paid by Visa and Mastercard, *id.* ¶ 58, the Apple Pay Contracts, referenced and incorporated into the Amended Complaint, ██████████████████████████████████████

████████████████████████.[3]

According to the Amended Complaint, the Alleged Restraints in the Apple Pay Contracts amount to a "horizontal market allocation" conspiracy and thus constitute a *per se* violation of Section 1 of the Sherman Act. *Id.* ¶ 65; *see also id.* ¶¶ 6, 68, 74, 82, 83, 151. Plaintiffs further contend that they and other merchants "suffered injury . . . by paying higher fees to Payment Card networks . . . that they would not have otherwise paid in the absence of Apple's unlawful conduct." *Id.* ¶ 154; *see also id.* ¶ 123 (alleging that "Plaintiffs and the Class . . . have sustained

---

[2] NFC, which stands for Near Field Communications, "is a method of wireless data transfer that allows Smart Mobile Devices . . . to share data when in close proximity." Am. Compl., App., xiii.

[3] *See* Ex. 1, § 5.1.1



Ex. 2, § 5.1.1

, Sch. A, § 10

(emphasis added).

That these fees are in fact paid by issuing banks is also confirmed by Plaintiffs' own sources cited in the Amended Complaint and other materials of which the Court may take judicial notice. *See* AnnaMaria Andriotis, *Apple Pay Fees Vex Credit-Card Issuers*, Wall Street Journal (Oct. 5, 2021), https://tinyurl.com/bdffwub7 (cited in Am. Compl. ¶ 59, n.23); *see also Affinity Credit Union v. Apple Inc.*, 4:22-cv-04174-JSW, Dkt. No. 64 (N.D. Cal. Sept. 27, 2023) (granting in part and denying in part motion to dismiss claims by payment card issuers alleging that "they pay supracompetitive issuer-transaction fees on purchases made with Apple Pay").

direct injury to their businesses or property [because] they have paid and continue to pay artificially inflated fees to the Entrenched Networks").

The Amended Complaint pleads no facts supporting any agreement between (or among) Apple and the payment card networks apart from the Apple Pay Contracts themselves. Thus, when the Amended Complaint refers to an "anti-competitive scheme," it refers only to the four separate bilateral agreements between Apple and each network for the provision of network services in Apple Pay.[4] Indeed, the district court in the Eastern District of New York explained: "the existence of Apple's agreements with Visa and Mastercard are central to the *Mirage* action, and absent those agreements, Plaintiff would have no facts upon which to base its claim." Suggestion of Remand at 12, *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, MDL No. 1720, Dkt. 9344 (July 1, 2024).[5]

## PROCEDURAL HISTORY

On December 14, 2023, Mirage filed this action in the Southern District of Illinois. On January 5, 2024, Visa filed a Notice of "Tag-Along" Action with the Judicial Panel on Multidistrict Litigation (the "JPML") in light of the overlap in the factual and legal issues

---

[4] *See* Am. Compl. ¶ 3 ("Apple reached agreements with Visa and then with Mastercard not to use the iPhone to establish its own independent POS Transaction Payment network. . . . Upon information and belief, Apple later reached similar agreements with American Express and Discover."); ¶ 6 ("Since entering into these unlawful agreements, starting in 2014, Apple and the Entrenched Networks have . . . reaffirm[ed] th[ese] agreement[s] (via written contract) as recently as 2020."); ¶ 57 ("Visa, Mastercard, and Apple concocted an anticompetitive scheme . . . [with] Apple agree[ing] that it would not create its own payment system that would compete with Visa and Mastercard's payment systems. . . . Upon information and belief, similar agreements were reached with Amex contemporaneously with the Apple Pay roll-out and between Apple and Discover in 2015."); ¶ 63 ("On information and belief, Apple renewed its anticompetitive agreements with Visa, Mastercard, and Amex in 2017 and 2020, each agreement running for a renewable three-year term. On information and belief, Discover has similarly renewed its agreement with Apple.").

[5] Likewise, Plaintiff Mirage Wine & Spirits ("Mirage") explained in the JPML transfer proceeding that this "suit focuses on Apple's agreements with the Networks" and "challenges in a single count Apple's agreements with Visa and Mastercard" as "a horizontal market allocation." Memo. in Supp. of Plf.'s Mot. to Vacate Conditional Transfer Order (CTO-35) at 7, *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, MDL No. 1720, Dkt. No. 517-1 (Feb. 26, 2024).

presented by this action and the other actions consolidated in MDL 1720. The JPML issued a Conditional Transfer Order (CTO-35) on February 2, 2024. On June 5, 2024, the JPML denied Mirage's motion to vacate CTO-35 and transferred this action to the Eastern District of New York as part of MDL 1720. Dkt. 76. On July 1, 2024, that court *sua sponte* issued a Suggestion of Remand, urging the JPML to remand this action to this Court. On July 3, 2024, the JPML issued a Conditional Remand Order, and that Order became final on July 11. Dkt. 80. On August 5, 2024, Plaintiffs filed an Amended Complaint. Dkt. 101. Defendants are contemporaneously filing a motion to stay discovery pending the Court's decision on their motions to dismiss.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In reviewing a complaint on a motion to dismiss, courts give no effect to assertions of law or to "a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 55 U.S. at 555).

"*Twombly* bars the discover-first, plead-later approach." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 835 (7th Cir. 2021). "Only by

requiring plaintiffs to plead facts plausibly suggesting conspiracy can we 'avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support a § 1 claim.'" *Id.* (quoting *Twombly*, 550 U.S. at 559). "Courts, then, must 'insist upon' specificity and clarity in antitrust pleadings." *Riley v. Info. Sys. Audit & Control Ass'n, Inc.*, 2023 WL 3997075, at *1 (N.D. Ill. June 14, 2023).

On a Rule 12(b)(6) motion, courts must consider the complaint in its entirety as well as "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 992 n.10 (N.D. Ill. 2022) (finding that, because a merger was "referenced in" the complaint and "central to Plaintiffs' claim," "the merger agreement is incorporated by reference into the [complaint] and is properly considered in connection with the motions to dismiss"). "To the extent that an exhibit attached to or referenced by the complaint contradicts the complaint's allegations, the exhibit takes precedence." *Phillips v. Prudential Ins. Co. of America*, 714 F.3d 1017, 1020 (7th Cir. 2013). "A court is not bound by the party's characterization of an exhibit and may independently examine and form its own opinions about the document." *Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007).

## ARGUMENT

Plaintiffs bring a claim under Section 1 of the Sherman Act, which prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1. "Independent action is not proscribed" under Section 1. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Thus, to state a claim under Section 1, a plaintiff must adequately allege that the defendant "(1) entered into an agreement, that (2) unreasonably restrains trade in the relevant market." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 14 F.4th 831,

833 (7th Cir. 2021). "Concerted action is, of course, the *sine qua non* of any conspiracy in violation of § 1." *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 642 (N.D. Ill. 2020).

More specifically, to make out a Section 1 claim, the plaintiff must allege that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto*, 465 U.S. at 764). "That is, the circumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful agreement." *Id.*

To show the "existence of an agreement that violates §1 of the Sherman Act," a plaintiff's complaint must "be pleaded plausible through allegations of fact." *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021). "Such allegations usually take one of two forms: (1) direct allegations of an agreement, like an admission by a defendant that the parties conspired; or (2) more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed." *Id.* "The task before any plaintiff is thus to find and produce evidence that reveals coordination or agreement." *Id.*

Plaintiffs fail to plausibly plead any agreement in violation of Section 1 because the Apple Pay Contracts, on which the Amended Complaint entirely relies, contradict Plaintiffs' allegations, and Plaintiffs offer no other direct or circumstantial evidence of an agreement. The remaining factual allegations describe nothing more than unilateral decisions, which do not permit an inference of any agreement, let alone a multi-party conspiracy to unlawfully restrain trade.

## A. No Direct Evidence of Conspiracy:  the Apple Pay Contracts Do Not Contain Any of the Alleged Restraints

The Apple Pay Contracts are "agreements" in the ordinary sense, but they do not constitute "agreements *in restraint of trade*" as required under Section 1.  The "mere existence" of a written agreement does not, without more, qualify as concerted action within the meaning of the Sherman Act.  *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1203-04 (7th Cir. 1981); *see also Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016) (the "simple existence of the contract . . . standing alone, is [not] enough to satisfy the concerted action requirement").  "Only if such an agreement contains [the] restrictions" on which the plaintiff's antitrust theory relies "does the possibility of a Sherman Act violation arise."  *Quality Auto Body*, 660 F.2d at 1203; *see also Procaps*, 845 F.3d at 1081 (holding that a written contract satisfies the concerted action requirement "only if it embodies an agreement to unlawfully restrain trade").

Where the agreement on which a Section 1 claim is predicated does not contain the alleged restraint, the claim must be dismissed.  *See Always Towing*, 2 F.4th at 704 (affirming dismissal where, despite plaintiff's argument that a written contract was direct evidence of an unlawful horizontal agreement, "plaintiffs have not carried their burden to show a resultant unreasonable restraint of trade . . . *through* the [written contract]") (emphasis added); *Braman v. The CME Grp., Inc.*, 149 F. Supp. 3d 874, 895 (N.D. Ill. 2015) (dismissing Section 1 claim where plaintiffs alleged "the existence of a contract" in the form of incentive agreements that promoted high frequency trading but failed to allege that those agreements contained "*any* restraint on trade, let alone an unreasonable restraint on trade") (emphasis in original).[6]  Simply

---

[6] *See also Quality Auto Body*, 660 F.2d at 1199 (affirming dismissal on summary judgment because the agreements on which plaintiff's price-fixing claim was predicated reflected "nothing more than contracts between a buyer and a seller determining the price of services that the seller will perform, and are not illegal"); *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 985–86 (9th Cir. 2001) (affirming summary judgment dismissal where, "[a]lthough the

put, "[t]here can be no restraint of trade without a restraint." *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397 (7th Cir. 1989).

That truism decides this case. The terms of the Apple Pay Contracts with Visa and Mastercard do not restrain Apple from (1) creating its own payment network; (2) using direct bank-to-bank transfers (*e.g.*, ACH) as a payment method in Apple Pay; or (3) sharing its NFC hardware with third-party app developers. Those contracts, each running roughly 100 pages, are *silent* as to bank-to-bank transfers and NFC. Instead of restricting how Apple makes Apple Pay available to consumers, the Apple Pay Contracts each ████████████████████████████ ████████████████████████████████████████████████████████████████

████████████ *See* Ex. 1, Sch. A, § 9 ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████; Ex. 2, § 2.10.1 ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████.

Further, nothing in the agreements restricts Apple's unilateral right to build or acquire its own competing payment network. The express terms of the agreement with Visa ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

contracts between the parties are direct evidence of agreements, neither those agreements, nor any other evidence, constitute direct evidence of an agreement for concerted action in restraint of trade in violation of section 1 of the Sherman Act").

███████████████████████████████████████████████████. Ex. 1, § 10.2.3 ██████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████; *id.* § 2.2 ███████████████████

████████████████████████████████████████████████

███████.

    The Mastercard agreement ██████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████. Ex. 2, § 7.2.8(b) █████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████ (emphasis added).[7] Thus, this supposed agreement by Apple not to compete is

not only absent from either agreement; it is, in fact, contradicted by the actual contract language.

    Visa's ██████████████████████████████████████████████, and

Mastercard's ████████████████████████████████████████████████

█████████████████████████████, are each consistent with the "general [antitrust]

rule" that "businesses are free to choose the parties with whom they will deal, as well as the

prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555

---

[7] The Apple Pay Contracts ████████████████████████████████████████████████

████████████████████████ Ex. 1, § 4.2; Ex. 2, § 4.2.

U.S. 438, 448 (2009); *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 21–22 (D.D.C. 2021) ("[Defendants have] right to refuse to deal with other firms, which includes the right to refuse to cooperate with rivals.") (cleaned up). But more to the point (as it relates to this motion), the express terms of these provisions contradict Plaintiffs' central allegations, and as supposedly "direct evidence" of the alleged agreement, those terms must be taken at face value. *See In re Turkey Antitrust Litig.*, 642 F. Supp.3d 711, 722 (N.D. Ill. 2022) ("Direct evidence of an agreement is explicit and requires no inferences to establish the proposition or conclusion being asserted.") (citations omitted).

　　*In re Google Digital Advertising Antitrust Litigation*, 627 F. Supp. 3d 346 (S.D.N.Y. 2022), is instructive. There, plaintiffs alleged that a provision in an agreement between Google and Facebook limited competitive bidding for in-app advertising in violation of Section 1. *Id.* at 373. The court granted Google's motion to dismiss the collusive bidding claim, finding that the "the express terms" of that "provision do not on [their] face . . . constrain Google's actions" and "cannot be reasonably read to require collusive bidding." *Id.* at 376. Similarly, in *Dream Big Media Inc. v. Alphabet Inc.*, 2024 WL 3416509 (N.D. Cal. July 15, 2024), the court dismissed a Section 1 claim because "the express terms" of the alleged agreement could not "reasonably . . . be understood" as imposing the alleged restraint (*i.e.*, a broad prohibition on "using" or "displaying" non-Google content with Google Maps) notwithstanding the existence of a narrower restraint (*i.e.*, a prohibition on third-party apps "linking" a Google Map to non-Google content). *Id.* at *3. The court agreed that plaintiffs were "improperly asking the court to expand[] the scope of [the contractual provision]" beyond its "plain language." *Id.* at *3–4.

　　Even more so here. That Apple's agreement with Visa ███████████████ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ and thus that there is no agreement not to compete.  *See* Ex. 1, § 10.2.3.

Apple's agreement with Mastercard ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████.  *See* Ex. 2, § 7.2.8(b).  Contrary to showing any

conspiracy, the language from the respective agreements confirms that Apple remains free to

create its own payment network, directly refuting Plaintiffs' unsupported allegations that any

Defendant bargained for—much less consciously schemed with—Apple to refrain from doing so.

To the extent Plaintiffs contend that the above-cited provisions in the Apple Pay

Contracts are direct evidence of a "market division" agreement, they would be distorting the

plain language to give it the exact opposite meaning.  Put another way, the fact that Visa and

Mastercard each bargained with Apple for different contractual consequences if Apple developed

its own competing payment network does not give rise to a reasonable inference that Apple, Visa,

and Mastercard had the requisite "conscious commitment to a common scheme designed to

achieve an unlawful objective" of preventing Apple from entering as an alternative payment

network.  *See Omnicare*, 629 F.3d at 706 (quoting *Monsanto*, 465 U.S. at 764).  The Apple Pay

Contracts demonstrate only that, if Apple decided to go that route and compete directly with Visa

and Mastercard, Visa and Mastercard would not be forced to help Apple do so using their own

technologies, and instead the parties would compete individually—precisely the type of

competition encouraged by the Sherman Act.

For these reasons, any objective reading of the above-cited provisions in the Apple Pay

Contracts would "not support the existence of [the] broader conspiracy" alleged in the Amended

Complaint.  *See In re German Auto. Manufacturers Antitrust Litig.*, 612 F. Supp. 3d 967, 981

(N.D. Cal. 2020), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) (granting motion to dismiss Section 1 claim based on express contract terms); *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 374 (S.D.N.Y. 2016) (contract showing that "an agreement existed" was insufficient to support a Section 1 claim "because no allegations connect this agreement" to the challenged conduct). Because Plaintiffs fail to show that the Apple Pay Contracts with Visa or Mastercard contain "*any* restraint on trade, let alone an unreasonable restraint on trade," their Section 1 claim must be dismissed. *See Braman*, 149 F. Supp. 3d at 895; *Schachar*, 870 F.2d at 397 ("There can be no restraint of trade without a restraint.").

### B. No Circumstantial Evidence of Conspiracy: the Amended Complaint's Other Factual Allegations Do Not Plausibly Support the Existence of an Unlawful Agreement

The Amended Complaint also does not allege circumstantial evidence of an agreement. Circumstantial evidence requires the plaintiff to adequately allege "parallel conduct and additional factual circumstances or 'plus factors,' that are indicative of an agreement." *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d at 722. "Sufficient circumstantial evidence may include 'a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion.'" *Id.* (quoting *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010)). The court must also consider whether there are "alternative, non-conspiratorial explanations for Defendants' conduct." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp.3d 772, 790 (N.D. Ill. 2017). "[L]egal conclusion[s] couched as factual allegations" should be given no effect. *Twombly*, 550 U.S. at 555–56; *see also Ass'n of Am. Physicians & Surgeons*, 15 F. 4th at 834 (affirming dismissal of Section 1 claim because the complaint contained nothing more than "conclusory allegations" that defendants "'agreed,' 'conspired,' [or] 'colluded,'" and "[r]epetition cannot substitute for factual allegations").

The Amended Complaint does not purport to identify any parallel conduct or "plus factors." The Amended Complaint's factual allegations do not give rise to an inference of an unlawful agreement between any pair of, let alone among all three of, the Defendants. For example, it does not cite any interactions between Apple, Visa, or Mastercard (or with non-defendant alleged co-conspirators American Express or Discover) as a factual basis for any alleged "market allocation" agreement beyond the Apple Pay Contracts themselves. And apart from those written contracts (which plainly do not contain the Alleged Restraints), the Amended Complaint "is silent about [Defendants'] role in a conspiracy." *See United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 904 (N.D. Ill. 2019); *see also In re Google Digital Advertising*, 627 F. Supp. 3d at 376 (finding that, even if alleged direct evidence were not "taken at face value," the complaint did not plausibly allege "the existence of side deals, [or] winks or nod that augment the terms of the [written agreement]").

The Amended Complaint's only other factual allegations in connection with any challenged conduct establish that Apple *unilaterally* and *independently* restricts access to its proprietary NFC hardware on third-party payment apps. Plaintiffs do not even attempt to offer factual allegations that plausibly link Visa or Mastercard to Apple's decision to impose those restrictions. As discussed above, the Apple Pay Contracts are silent regarding NFC access. Instead, Plaintiffs allege that "*Apple's* NFC guidelines," which "govern developers' use of Apple's device's NFC hardware," are found in "*Apple's* Developer Program License Agreement"—an agreement Apple has with app developers, *not* with Visa or Mastercard (or American Express or Discover). *Id*. ¶ 88 (emphasis added). The Amended Complaint admits— as it must—that these are "*Apple's* restrictions." *Id*. ¶ 93 (emphasis added). But of course,

Apple's "[i]ndependent action is not proscribed" under Section 1.  *See Monsanto*, 465 U.S. at 761.  And Apple's independent action cannot provide a basis for a Section 1 claim.

Plaintiffs in other cases have similarly failed to persuade courts to convert Apple's unilateral app store guidelines into a Section 1 agreement, resulting in dismissal on the pleadings.  In *Bakay v. Apple*, for example, the plaintiffs alleged that a provision in Apple's App Store Guidelines violated Section 1 by preventing the use of certain web browsers on the iPhone.  2024 WL 3381034, at *1 (N.D. Cal. July 11, 2024).  In dismissing the plaintiffs' claim, the court found that the guidelines did not constitute an unlawful agreement under Section 1:  "Even accepting . . . that Guideline 2.5.6 is an express agreement between Apple and browser app developers . . . it is unclear how this agreement constitutes an unlawful agreement.  Plaintiffs have provided no facts to suggest that a developer's decision to create a WebkKit-based browser pursuant to Guideline 2.5.6. constitutes an unlawful agreement."  *Id.* at *4; *see also Pierre v. Apple Inc.*, No. 23-cv-05981, Dkt. 49 at 1 (N.D. Cal. Mar. 26, 2024) ("[I]t is not clear how companies agreeing to a guideline outlining the Apple Store requirements for apps facilitating cryptocurrency transactions constitutes an unlawful agreement under Section 1 of the Sherman Act.").

Plaintiffs' reliance on statements made by foreign regulators to depict Apple's NFC decision as allegedly anticompetitive (*e.g.*, Am. Compl. ¶¶ 90–91, 95, 100, 102–110) only reinforces the conclusion that Apple's *unilateral* policies and practices regarding its NFC hardware stem from Apple's *independent* decisions and have nothing to do with any agreement with either Visa or Mastercard.  *See id.* ¶ 100 ("[T]he Commission had begun a formal investigation of Apple Pay, with preliminary concerns over Apple's NFC chip and the technical lock *placed by Apple*, *Apple's terms and conditions* . . . and *Apple's refusal* to allow rivals access to the payment system."); *id.* (referring to the Commissions' "concerns [with] *Apple's conduct*");

*id.* ¶ 102 (referring to the Commission's "preliminary view . . . that *Apple's conduct* violates EC competition (antitrust) law."); ¶ 103 (referring to the Commission's statement that it "takes issue with the decision *by Apple* to prevent" access to NFC) (all emphases added).

Plaintiffs allege no facts to support their wholly conclusory assertion that "[u]pon information and belief" the "agreements with the Entrenched Networks" are part of the European Commission's ("EC") investigation of Apple. *Id.* ¶ 101. To the contrary, Plaintiffs specifically allege that the EC is investigating "monopoly conduct" by Apple, *id.* ¶ 102, not a conspiracy with Visa or Mastercard. And, according to an EC press release quoted by Plaintiffs, *id.* ¶ 103 n.52, "Apple controls every aspect of the user experience in this [Apple Pay] ecosystem." EC Press Release, *Antitrust: Commission Sends Statement of Objections to Apple over Practices Regarding Apple Pay* (May 22, 2020), https://tinyurl.com/4j5498z4.[8]

Finally, the Apple Pay Contracts confirm—contrary to any "cash bribe" by the networks alleged by Plaintiffs, Am. Compl. ¶ 58— ███████████████████████████████
████████████████████████████████████████████████████████████████████
██████████ Ex. 1, § 5.1.1 ███████████████████████████████████████████

---

[8] The Court may also take judicial notice of the DOJ's recent civil antitrust lawsuit against Apple, alleging that Apple *unilaterally* has refused to allow certain third-party payment apps access to NFC hardware on Apple devices in violation of Section 2 of the Sherman Act. Am. Compl., ¶¶ 111–15, *U.S. v. Apple Inc.*, 2:24-cv-04055 (D.N.J.), Dkt. 51 (filed June 11, 2024); *see Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (stating that courts may take judicial notice of court documents). Notably, neither the DOJ nor the EC contends that Apple's NFC-related practices harm competition in the network services market for merchants that Plaintiffs allege here. *See* Am. Compl., ¶¶ 165, 172, *U.S. v. Apple Inc.*, 2:24-cv-04055 (D. N.J.) (relevant markets alleged to be one for "smartphones" and "performance smartphones"); EC Press Release, *Antitrust: Commission Sends Statement of Objections to Apple over Practices Regarding Apple Pay* (May 22, 2020), https://tinyurl.com/4j5498z4 (relevant market alleged to be a "mobile wallets market on iOS").

Moreover, on August 14, 2024, Apple announced that it will no longer restrict access to its proprietary NFC hardware on third-party payment apps in the United States and other regions. Apple Press Release, *Developers can soon offer in-app NFC transactions using the Secure Element* (Aug. 14, 2024), https://tinyurl.com/22brfebh. This unilateral rule change by Apple is even more evidence that Apple's NFC restriction had nothing to do with Visa or Mastercard in the first place.



**█████████████████████████████████████████████**, Sch. A, § 10 **████████████████████████████**; Ex. 2, § 5.1.1 **██████████████████████████████████████**

**████████████████████████████████████**, Sch. A, § 10 **███████████████████**

**████████████████████**; *see supra* at note 3 (showing that the Amended Complaint's own sources confirm that these fees are paid by issuing banks) (all emphases added). Plaintiffs allege no facts connecting the fees that issuing banks pay to Apple to an alleged "market division" conspiracy among Apple and the payment networks. The Amended Complaint's wholly conclusory characterization of these fees as a "cash bribe" is no substitute for factual allegations as to why those payments by issuing banks somehow evidence a conspiracy involving Visa or Mastercard. This characterization therefore must be disregarded on a motion to dismiss. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

**<u>CONCLUSION</u>**

The Visa and Mastercard Defendants respectfully request that this Court grant their motion to dismiss with prejudice Plaintiffs' Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated: September 26, 2024

Respectfully submitted,

**HOLWELL SHUSTER & GOLDBERG LLP**

*<u>/s/ Demian A. Ordway</u>*

Michael S. Shuster (admitted *pro hac vice*)
Demian A. Ordway (admitted *pro hac vice*)
Zachary A. Kerner (*pro hac vice* forthcoming)

425 Lexington Avenue
New York, NY 10017
(646) 837-5151
mshuster@hsgllp.com
dordway@hsgllp.com
zkerner@hsgllp.com

**ARNOLD & PORTER KAYE SCHOLER LLP**

Robert J. Vizas (*pro hac vice* forthcoming)
Three Embarcadero Center, Tenth Floor
San Francisco, CA 94111-4024
(415) 471.3100
robert.vizas@arnoldporter.com

Anne P. Davis (admitted *pro hac vice*)
Matthew A. Eisenstein (admitted *pro hac vice*)
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
anne.davis@arnoldporter.com
matthew.eisenstein@arnoldporter.com

Valerie Hays (admitted *pro hac vice*)
Nicholas Zebrowski (admitted *pro hac vice*)
70 West Madison Street, Suite 4200
Chicago, Illinois 60602-4321
(312) 583-2440
valarie.hays@arnoldporter.com
nicholas.zebrowski@arnoldporter.com

*Counsel for Defendant Visa Inc.*

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**

Brette Tannenbaum (admitted *pro hac vice*)
Nina Kovalenko (admitted *pro hac vice*)
Gary R. Carney (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990
btannenbaum@paulweiss.com
nkovalenko@paulweiss.com

gcarney@paulweiss.com

Kenneth A. Gallo  (*pro hac* forthcoming)
Donna M. Ioffredo (admitted *pro hac vice*)
2001 K Street, NW
Washington, D.C. 20006-1047
Tel.: (202) 223-7300
Fax: (202) 223-7420
dioffredo@paulweiss.com

*Counsel for Defendant Mastercard Incorporated*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2024, I caused a true and correct copy of the foregoing to be served on all counsel of record for all parties that have appeared via the Court's CM/ECF System.

*/s/ Demian A. Ordway*
Demian A. Ordway