# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

MIRAGE WINE + SPIRIT'S, INC.,
d/b/a MIRAGE WINE & SPIRITS;
MARTLET MEADOWS FARM, LLC,
d/b/a DOUBLE BUBBLE CAR WASH;
PARCELLE LLC, d/b/a PARCELLE
ORGANICS; FOGGY BOTTOM BOYS,
LLC; and FAMILIA COFFEE,
Individually and on Behalf of All Others
Similarly Situated,

                Plaintiffs,

    v.

APPLE INC.; VISA INC.; and
MASTERCARD INCORPORATED,

                Defendants.

Case No. 3:23-cv-3942-DWD

Hon. David W. Dugan

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTIONS TO DISMISS

### Public Redacted Version

**TABLE OF CONTENTS**

I.     FACTUAL BACKGROUND......................................................................................1

II.    LEGAL STANDARD ..........................................................................................9

III.   HORIZONTAL MARKET DIVISIONS—SUCH AS THE PLAINTIFFS
       ALLEGE—ARE ILLEGAL *PER SE*................................................................11

IV.    THE PLAINTIFFS HAVE ALLEGED DIRECT EVIDENCE OF AGREEMENTS
       (AND IN THE CASE OF VISA, AN UNLAWFUL AGREEMENT). ......................14

V.     THE PLAINTIFFS HAVE PLEADED AMPLE CIRCUMSTANTIAL EVIDENCE
       THAT APPLE ILLEGALLY AGREED WITH VISA AND MASTERCARD TO
       STAY OUT OF THE RELEVANT MARKET...........................................................16

       A.     The Defendants took similar actions at approximately the same
              time....................................................................................................16

       B.     Circumstantial evidence—including well-recognized "plus factors"
              supports the inference of illegal conduct. ....................................17

VI.    THE PLAINTIFFS HAVE ANTITRUST STANDING.............................................24

VII.   THE COURT SHOULD GRANT LEAVE TO AMEND IF IT GRANTS ANY
       PORTION OF THE MOTION TO DISMISS..............................................28

VIII.  CONCLUSION...........................................................................................29

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Alioto v. Town of Lisbon,*
   651 F.3d 715 (7th Cir. 2011) ............................................................................. 28

*Amarel v. Connell,*
   102 F.3d 1494 (9th Cir. 1996) .......................................................................... 22

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth,*
   99 F.4th 928 (7th Cir. 2024) ........................................................................... 10

*Arth Main Street Drugs, Inc. v. Beer Distribs. of Indiana, Inc.,*
   No. F 77-73, 1984 WL 19606 (N.D. Ind. Nov. 27, 1984) ...................................... 18

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................................... 10

*Associated Gen. Contractors v. Cal. State Council of Carpenters,*
   459 U.S. 519 (1983) ...................................................................................... 27

*B&R Supermarket, Inc. v. Visa, Inc.,*
   No. 17-cv-2738, 2024 WL 4334075 (E.D.N.Y September 27, 2024) ....................... 25

*Bakay v. Apple Inc.,*
   No. 24-cv-00476-RS, 2024 WL 3381034 (N.D. Cal. July 11, 2024) ...................... 27

*Barry's Cut Rate Stores, Inc. v. Visa, Inc.,*
   No. 05-MD-1720 (MKB) (JO), 2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019) ........... 23

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................ 9, 10, 17

*Blackburn v. Sweeney,*
   53 F.3d 825 (7th Cir. 1995) ............................................................................ 11

*Bodie–Rickett & Associates v. Mars, Inc.,*
   957 F.2d 287 (6th Cir. 1992) .......................................................................... 27

*Braden v. Wal-Mart Stores, Inc.,*
   588 F.3d 585 (8th Cir. 2009) .......................................................................... 10

*Burke v. 401 N. Wabash Venture, LLC,*
   714 F.3d 501 (7th Cir. 2013) ............................................................................ 1

*DM Rsch., Inc. v. Coll. of Am. Pathologists,*
170 F.3d 53 (1st Cir. 1999) ........................................................ 9

*Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.,*
No. 22-15231, 2023 WL 4677017 (9th Cir. Jul. 21, 2023) ...................... 21

*Fricke-Parks Press, Inc. v. Fang,*
149 F. Supp. 2d 1175 (N.D. Cal. 2001) ...................................... 11

*FTC v. Actavis, Inc.,*
570 U.S. 136 (2013) .............................................................. 26

*Gainesville Utilities Dep't. v. Florida Power & Light Co.,*
573 F.2d 292 (5th Cir. 1978) ................................................... 21

*Hosp. Bldg. Co. v. Trs. of Rex. Hosp.,*
425 U.S. 738 (1976) .............................................................. 10

*In re Auto. Refinishing Paint Antitrust Litig.,*
No. MDL 1426, 2004 WL 7200711 (E.D. Pa. Oct. 29, 2004) .................. 20

*In re Insurance Broker Antitrust Litig.,*
618 F.3d 300 (3d Cir. 2010) .................................................... 11

*In re Local TV Advert. Antitrust Litig.,*
No. 18 C 6785, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ............. 10, 19

*In re Musical Instruments and Equip. Antitrust Litig.,*
798 F.3d 1186 (9th Cir. 2015) .................................................. 17

*In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.,*
330 F.R.D. 11 (E.D.N.Y. 2019) ................................................ 23

*In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.,*
714 F. Supp. 3d 65 (E.D.N.Y. 2024) .......................................... 21

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
No. 1:05-md-01720-MKB-JAM, 2024 WL 1014159 (E.D.N.Y. Mar. 8, 2024) ................... 25

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
No. 1:05-md-01720-MKB-JAM, 2024 WL 1556931 (E.D.N.Y. Apr. 10, 2024) ........... 24, 25

*In re Pre-Filled Propane Tank Antitrust Litig.,*
860 F.3d 1059 (8th Cir. 2017) .................................................. 11

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010).................................................. 10, 17

*In re Virginia Foundry Co., Inc.*,
   9 B.R. 493 (W.D. Va. 1981) ...................................................... 16

*In re Visa Check/Mastermoney Antitrust Litig.*,
   No. 96-cv-5238 (JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ....................................... 24

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   752 F.3d 728 (8th Cir. 2014)................................................... 18, 21

*Jones v. Sparta Cmty. Hosp.*,
   716 F. App'x 547 (7th Cir. 2018) ................................................. 8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ........................................................... 11, 19

*Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*,
   969 F.2d 1384 (2d Cir. 1992)...................................................... 2

*LifeWatch Servs. Inc. v. Highmark Inc.*,
   902 F.3d 323 (3d Cir. 2018) ..................................................... 19

*Markson v. CRST International, Inc.*,
   No. 517-cv-01261-VAP-SPx, 2019 WL 6354400 (C.D. Cal. Mar. 7, 2019) .......................... 17

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984) ............................................................ 17

*N. Pac. Ry. Co. v. United States*,
   356 U.S. 1 (1958) .............................................................. 11

*NCAA v. Bd. of Regents of Univ. of*,
   468 U.S. 85 (1984) ............................................................. 11

*NewSpin Sports, LLC v. Arrow Elecs., Inc.*,
   910 F.3d 293 (7th Cir. 2018).................................................... 28

*Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*,
   394 U.S. 700 (1969) ............................................................ 17

*Phillips v. Prudential Ins. Co. of Am.*,
   714 F.3d 1017 (7th Cir. 2013)................................................... 8

*R3 Composites Corp. v. G&S Sales Corp.*,
960 F.3d 935 (7th Cir. 2020) ............................................................................. 28

*Refco Group Ltd., LLC v. Cantor Fitzgerald, L.P.*,
No. 13 CIV. 1654(RA), 2014 WL 2610608 (S.D.N.Y. Jun. 10, 2014) ................... 15

*Runnion v. Girl Scouts of Greater Chicago & N.W. Ind.*,
786 F.3d 510 (7th Cir. 2015) ............................................................................. 28

*Sanner v. Board of Trade of City of Chicago*,
62 F.3d 918 (7th Cir. 1995) ............................................................................... 27

*Serfecz v. Jewel Food Stores, Inc.*,
No. 92 C 4171, 1994 WL 478576 (N.D. Ill. August 31, 1994) ........................... 27

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010) ........................................................................ 21, 23

*Tiz, Inc. v. Southern Glazer's Wine & Spirits, LLC*,
No. 22 CV 1648, 2024 WL 2785142 (N.D. Ill. May 30, 2024) ............................ 17

*Todd v. Exxon Corp.*,
275 F. Supp. 191 (2d Cir. 2001) ........................................................................ 17

*United States v. Joyce*,
895 F.3d 673 (9th Cir. 2018) ............................................................................. 11

*United States v. Topco Associates*,
405 U.S. 596 (1972) .......................................................................................... 11

*United States v. Visa U.S.A., Inc.*,
163 F. Supp. 2d 322 (S.D.N.Y. 2001) ................................................................ 12

*United States v. Visa U.S.A., Inc.*,
344 F.3d 229 (2d Cir. 2003) ........................................................................ 21, 22

*United States, v. American Express Co.*,
88 F. Supp. 3d 143 (E.D.N.Y. 2015) .................................................................. 22

*Vasquez v. Indiana Univ. Health, Inc.*,
40 F.4th 582 (7th Cir. 2022) ............................................................................. 10

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005) ................................................................................ 22

**Rules**

Case 2:24-cv-00025-APG-DJA   Document 45-1 Filed 11/11/24   Page 7 of 39

Fed. R. Civ. P. 15(a)(2) ................................................................................. 28

**Statutes**

15 U.S.C. § 1 ........................................................................... 15, 19, 22

15 U.S.C. § 2 .................................................................................. 19

## I.    FACTUAL BACKGROUND[1]

Visa and Mastercard, along with American Express and Discover (collectively, the "Entrenched Networks") dominate the U.S. market for Point-of-Sale ("POS") Payment Card Network Services (the "Relevant Market").[2] This dominance was no accident. For reasons detailed in a procession of prior lawsuits, the Entrenched Networks used collusive agreements and exclusionary tactics to protect their stranglehold on the Relevant Market. As a result, the Entrenched Networks historically have been able to impose supracompetitive fees on U.S. Merchants for the use of their POS Transaction Payment networks.[3]

By the early 2010s, however, this was all about to change. The mobile phone, specifically Apple's iPhone—a device that had already disrupted taxicabs, music distribution, and retail—was poised to knock the Entrenched Networks out of their comfortable middleman position in the payments industry. The Entrenched Networks feared that Apple and its iPhone would disrupt (or in their words "disintermediate")[4] the payment-network industry by establishing its own payment network, thereby undercutting and driving down the fees that the Entrenched Networks have imposed

---

[1] The facts are set forth in the light most favorable to the Complaint, as the Court must view them. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 504 (7th Cir. 2013).

[2] *See generally* Am. Compl. ¶ 1, *Mirage Wine + Spirits, Inc. v. Apple Inc.*, No. 3:23-cv-03942-DWD (S.D. Ill. Aug. 5, 2024), ECF No. 101. All citations to "Am. Compl." are to the Amended Complaint in this matter.

[3] *Id.*

[4] *Id.* ¶ 2.

on Merchants for over half a century.[5] Indeed, Apple possessed a unique ability to disrupt the Relevant Market, given the widespread adoption of the iPhone by consumers worldwide, Apple's existing relationships with many U.S. merchants, and the iPhone's near-field communication ("NFC") functionality, which allowed it to connect directly with Merchant terminals.[6]

The Entrenched Networks' fears of Apple disrupting their longstanding payment networks were both real and reasonable. According to the United States Department of Justice, which is currently suing Visa for monopolization, Apple had engaged in discussions with a large debit issuer about building a payment network without Visa or Mastercard's involvement.[7] Apple had also branched into the payments industry in the early 2010s by filing several payments-related patents and by acquiring a number of start-up companies within the payments space.[8]

Adding further credence to the Defendants' fears over disintermediation, Apple had been actively working to partner with PayPal, a competitor to the Entrenched Networks, to jointly launch Apple Pay.[9] Under this arrangement, Apple Pay could have

---

[5] *Id.*

[6] *Id.* ¶ 5.

[7] Compl. ¶ 118, *United States v. Visa Inc.*, No. 1:24-cv-07214 (S.D.N.Y. Sept. 24, 2024), ECF No. 1. The Court may take judicial notice of the allegations in other litigation. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992). While the Court should not assume the truth of those allegations, *id.*, such a factual determination is not necessary on a motion to dismiss.

[8] Am. Compl. ¶ 52.

[9] *Id.* ¶ 61.

2

been funded using the National Automated Clearinghouse for Electronic Funds Transfers ("ACH"), through which consumers could connect directly to their bank accounts.[10] Apple could have thereby disintermediated the Entrenched Networks by substituting iPhone-based POS payments for POS Transaction Payments through the Entrenched Networks.

Visa and Mastercard, however, would not let that happen. The Networks approached Apple with an anticompetitive scheme designed to prevent it from doing what it had done to other legacy industries.[11] Under this scheme, Apple agreed (1) not to create its own payment system that would compete with the Entrenched Networks; (2) to artificially restrict the choices available to Merchants and consumers using Apple Pay for POS Transaction payments, by preventing the direct transfer of funds from consumers' bank accounts to Merchant bank accounts; and (3) to block other third-party payment applications installed on iPhones from residing in the Apple Wallet or to use the iPhone's NFC functionality to facilitate POS Transactions in the Relevant Market.[12] In exchange for Apple's agreement not to compete with the Entrenched Networks, Visa and Mastercard paid Apple a substantial bribe; ████████████████████

████████████████████████████████████████████

████████████████████████████████████[13]

---

[10] *See id.* ¶ 57.

[11] *See id.*

[12] *Id.*

[13] *Id.* ¶ 58. ████████████████████████████████
████

After finalizing its agreement with Visa and Mastercard in August 2014,[14] Apple suddenly dropped its planned partnership with PayPal and excluded it from Apple Pay at Visa and Mastercard's request.[15] Apple instead limited Apple Pay to operating as a pass-through Mobile Wallet that merely facilitated payments through the Entrenched Networks, whose payment products were the only ones that could be loaded onto Apple Pay.[16] iPhone users remain unable to conduct bank-to-bank transfers for Apple Pay transactions, which could substantially reduce transaction costs to Merchants and thereby benefit both consumers and Merchants.[17]

But for the Defendants' anticompetitive agreements, it would be in Apple's economic interest to create its own payment system and charge lower fees than the supracompetitive fees charged to Merchants by the Entrenched Networks, while still making a handsome profit.[18] It would also be in Apple's interest to enable consumers to fund their Mobile Wallets[19] from sources other than those controlled by the Entrenched Networks, and to allow Merchants to accept those other payment systems, such as

---

[14] *Id.* ¶ 61.

[15] *Id.*

[16] *Id.* ¶ 66. While Apple Pay users have recently become able to load funds onto a digital "Apple Cash" card within the Apple Wallet, the Apple Cash card can only be loaded with funds using one of the Entrenched Networks' payment cards (as opposed to via bank-to-bank transfer) and subjects Merchants to the same transaction fees as they would have paid for a transaction on one of the Entrenched Networks. *Id.* ¶ 72.

[17] *Id.* ¶¶ 72-73.

[18] *Id.* ¶ 69.

[19] Capitalized terms have the same meanings given to them in the Amended Complaint.

direct bank-to-bank transfers.[20] Indeed, if Apple allowed consumers to fund Mobile Wallets from alternate sources, it could charge Merchants a highly profitable transaction fee that still remains significantly below the monopolistic transaction fees charged to Merchants by the Entrenched Networks, all while incentivizing consumers to use the cash balances in their Apple Wallets to make purchases.[21]

The anticompetitive scheme that the Plaintiffs allege included—but was not limited to—two "Payment Platform Agreements" ("PPAs")[22] that Apple executed with Visa and Mastercard in August of 2014.

Apple's PPA with Visa lasted for ▮▮▮ years, after which it automatically extends for consecutive ▮▮ year terms.[23] Under the PPA, Visa agrees ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮[24] Apple agrees ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[25]

---

[20] *Id.* ¶ 73.

[21] *Id.*

[22] *See generally* Def. Apple Inc.'s Mem. in Supp. of Mot. to Dismiss ("Apple Mem."), Exs. 1-2, *Mirage Wine + Spirits,* No. 3:23-cv-03942-DWD (Sept. 26, 2024), ECF Nos. 120-1, 120-2; Defs.' Visa and Mastercard's Mem. in Supp. of Mot. to Dismiss ("Visa/MC Mem."), Exs. 1-2, *Mirage Wine + Spirits,* No. 3:23-cv-03942-DWD (Sept. 26, 2024), ECF Nos. 116-1, 116-2.

[23] Visa/MC Mem., Ex. 1, § 10.1.

[24] *See, e.g., id.* § 2.2.

[25] *See, e.g., id.* § 2.8.4.

The Visa PPA provides that Visa will " ███████████████████████████
█████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████ "[26] The
same provision provides that " ████████████████████████████████████
█████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ "[27]

The PPA incorporates the premise that ███████████████████████████████
████████████████████████ Schedule A to the Visa PPA includes "Standardized
Issuer Terms," under which Apple and Visa require all participating Visa-card issuers
to " ████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
███████████ [28]

But the payments to Apple come with an important string attached. ███████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
██████████████████████ "[29] Should Visa terminate the Visa PPA, ██████████████
███████████████████████

---

[26] *Id.* § 5.1.1.

[27] *Id.*

[28] *Id.* at Schedule A § 10(a)-(b).

[29] *Id.* at Schedule A § 10.2.3.



The Visa and Mastercard PPAs are remarkably similar. Like the Visa PPA, ███

███████████████████████████████████████████████

██████████████████████████████████████████████,[30] █

██████████████████████████████████████████████

████████████████████████████[31]

Also like Visa, ████████████████████████████████

█████████████████████████ "██████████████████████

████████████████████████████████████████████████

██████████████████████████████████"[32] And like

Visa, ██████████████████████████████████████[33]

Mastercard's PPA also has a Schedule A that includes "Standardized Issuer Terms"

providing that all Mastercard card-issuers '█████████████████████████

████████████████████████████████████████████████

████████████████████████████████████[34] While

Mastercard's PPA does not explicitly ███████████████████████

---

[30] *See, e.g.,* Visa/MC Mem., Ex. 2, § 2.2.

[31] *See, e.g., id.* § 2.3.1(g).

[32] *Id.* § 5.1.1.

[33] *Id.*

[34] *Id.* at Schedule A § 10(a)-(b).

█████████████████████████████████

█████████████████████████████████

██

After the Plaintiffs filed this Complaint,[35] the Department of Justice's Antitrust Division filed its own complaint[36] against Visa for engaging in monopolistic practices to maintain its dominance in the debit-card market.[37] Based on a three-year investigation, the DOJ alleges that Visa employs a wide array of unlawful tactics to preserve debit-card monopoly, including incentives to prevent merchants and issuers from routing transactions to other networks and "induc[ing] potential competitors [like Apple] to sign contracts that preserve Visa's prime position in the payments ecosystem."[38]

Similar to the Plaintiffs' allegations in this action, the DOJ reveals that "Visa has deals with Apple in which Apple agrees that it may not develop or deploy payment functionality with the aim of competing with Visa, such as creating payment functionality that relies primarily on non-Visa payment processes or payment products. Apple is also barred from providing incentives 'with the intent of disintermediating

---

[35] *See generally* Am. Compl.

[36] *See generally* Compl., *United States v. Visa Inc.*, *supra* note 7.

[37] *Id.* ¶ 133.

[38] *Id.* This Court can fairly consider the allegations from the DOJ complaint in ruling on Apple's Motion to Dismiss. In the Seventh Circuit, courts may consider additional facts plaintiffs set forth when opposing a motion to dismiss "so long as those facts are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013) (citation omitted); *see also Jones v. Sparta Cmty. Hosp.*, 716 F. App'x 547, 547 (7th Cir. 2018) ("because [plaintiff-appellant] now elaborates on the factual allegations in his amended complaint, and his elaborations are consistent with the pleadings, we consider that information in our review").

Visa or inciting customers to cease using Visa Cards,'" in return for which "Visa shares its monopoly profits with Apple" to the tune of hundreds of millions of dollars in 2023 alone.[39] In short, "Visa benefits from partnering with established Big Tech players like Google and Apple by obtaining 'total control of ecommerce acceptance and online payments flow in their ecosystems,'" and it "targets a small number of [the] largest and most influential Big Tech merchants with custom incentive arrangements . . . in return for commitments from them not to dislodge Visa as the middleman, and other future commitments. These contracts amount to a horizontal product market division."[40] So too here.

## II.    LEGAL STANDARD

At the pleading stage, a Sherman Act § 1 claim only "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; *it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.*" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (emphasis added). "[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint." *DM Rsch., Inc. v. Coll. of Am. Pathologists,* 170 F.3d 53, 56 (1st Cir. 1999).

---

[39] Compl. ¶ 136, *United States v. Visa Inc., supra* note 7.

[40] *Id.* ¶¶ 134-35.

On considering a motion to dismiss, a court must "read the complaint as a whole, not . . . parse it 'piece by piece to determine whether each allegation, in isolation, is plausible.'" *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth,* 99 F.4th 928, 947 (7th Cir. 2024) (citing *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). "'[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations' . . . [and] the allegations do not even need to establish the probability of the plaintiff's recovery . . . . They need only present 'enough fact to raise a reasonable expectation that discovery will reveal evidence' of illegal acts." *Vasquez v. Indiana Univ. Health, Inc.,* 40 F.4th 582, 586-87 (7th Cir. 2022) (reversing the district court's dismissal of Sherman Act claims, and citing *Twombly*, 550 U.S. at 555-56). "Ultimately, evaluation of a complaint upon a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Braden*, 588 F.3d at 594 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009)); *see also In re Local TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *5 (N.D. Ill. Nov. 6, 2020).

Especially "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of Rex. Hosp.*, 425 U.S. 738, 746 (1976); *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). ("The plaintiffs have conducted no discovery. Discovery may reveal the smoking gun or bring to light additional circumstantial evidence that further tilts the balance in favor of liability.").

10

III.     **HORIZONTAL MARKET DIVISIONS—SUCH AS THE PLAINTIFFS
         ALLEGE—ARE ILLEGAL *PER SE*.**

"Horizontal agreements to allocate markets among competitors are *per se*

violations of § 1 of the Sherman Act." *Blackburn v. Sweeney*, 53 F.3d 825, 827 (7th Cir.

1995) (citing *United States v. Topco Associates*, 405 U.S. 596, 608 (1972)). That includes

agreements to allocate product markets between firms that may otherwise compete. *See*

*Fricke-Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1180 (N.D. Cal. 2001) ("[S]ection 1

makes allocations of product markets illegal . . . .") (citing *Topco Associates*, 405 U.S. at

608). "The '*per se* rule is applied when the practice facially appears to be one that would

always or almost always tend to restrict competition and decrease output.'" *United*

*States v. Joyce*, 895 F.3d 673, 676 (9th Cir. 2018) (citing *NCAA v. Bd. of Regents of Univ. of*

*Okla.*, 468 U.S. 85, 100 (1984) and *N. Pac. Ry. Co. v. United States,* 356 U.S. 1, 5 (1958)).

Indeed, horizontal restraints have "manifestly anticompetitive effects," *In re Pre-Filled*

*Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1067 (8th Cir. 2017), and "[j]udicial

experience has shown that [these] classes of restraints have redeeming competitive

benefits so rarely that their condemnation does not require application of the full-

fledged rule of reason. Paradigmatic examples are 'horizontal agreements among

competitors to . . . divide markets' . . . . [T]hese practices are ordinarily condemned as a

matter of law under an 'illegal *per se*' approach[,] because the probability that these

practices are anticompetitive is so high[,] . . . without inquiry into the particular market

context in which it is found." *In re Insurance Broker Antitrust Litig.*, 618 F.3d 300, 316 (3d

Cir. 2010) (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)).

11

Apple accuses the Plaintiffs of "mischaracterize[ing it] as a horizontal competitor to the payment networks in order to advance a *per se* conspiracy claim under Section 1."[41] According to Apple, its relationship with Visa and Mastercard was strictly vertical because it did not compete with the Entrenched Networks in the Relevant Market.

Apple's argument suffers from an obvious and fatal flaw — Apple is not a horizontal competitor *only because of the conspiracy alleged in the Complaint.* [42] The Complaint sufficiently alleges that, but for this agreement, Apple had the plan, intent, and ability to develop its own payment network. First, Apple has a long history of introducing new features that displaced formerly dominant products, such as cameras, GPS devices, and music players. Second, due to its large base of iPhone users, Apple Pay quickly attracted millions of U.S. merchants, aided by the NFC antenna in the iPhone that allows iPhone users to connect to those merchant terminals. This large scale of users on both the consumer and merchant sides solved the "chicken and egg problem" that plagued previous challengers to the Entrenched Networks.[43] Third, Apple had the economic incentive and ability to enter the POS Payment Card Network Services market. Because the fees imposed by the Entrenched Networks are so high, the Complaint alleges that Apple "could have charged Merchant fees that are less than the

---

[41] Apple Mem. at 9, *supra* note 22.

[42] *See* Am. Compl. ¶¶ 6, 57, 63.

[43] The Southern District of New York recognized this "'chicken-and-egg' problem of developing a merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce merchants to accept the system's cards in the first place." *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001) (subsequent history omitted).

Merchant discount fees charged by the Entrenched Networks . . . while still making a handsome profit."[44]

Still, Apple declaims the absence of "any facts plausibly suggesting that Apple ever had *any* plan or intent to develop its own payment network or was ever positioned to" enter the market.[45] The Complaint sets forth how Apple had the interest and ability to enter the Relevant Market, which is sufficient to bolster the plausibility of an anticompetitive agreement.

Before agreeing to the anticompetitive scheme, Apple had filed various payments-related patents, was acquiring payments-related start-ups, was working with the largest financial institutions in the country, and was planning a potential partnership with PayPal, another competitor to the Entrenched Networks.[46] According to the Complaint, the Entrenched Networks feared their disintermediation from payment transactions if Apple were to compete in the Relevant Market. Therefore, Visa, Mastercard, and the other Entrenched Networks offered to pay Apple "a very large and ongoing cash bribe" in exchange for Apple agreeing not to independently enter the POS Payment Card Network Services market.[47] This agreement was first disclosed in a Wall Street Journal Article in 2021.[48]

---

[44] Am. Compl. ¶ 5.

[45] Apple Mem. at 10.

[46] Am. Compl. ¶¶ 52, 61.

[47] *Id.* ¶ 58.

[48] *Id.* n.23.

The Plaintiffs' allegations—made without the benefit of discovery—are corroborated by the fruits of the DOJ's three-year investigation into Visa. According to the DOJ's complaint, Apple had advanced discussions with a debit-card issuer about building a network without Visa or Mastercard," (*i.e.*, to *compete* with them).[49] Visa knew of Apple's plan and viewed Apple as an "existential threat."[50]

Apple cannot, therefore, honestly argue that it is not a horizontal competitor to the Entrenched Networks, nor that the Plaintiffs have not pled any facts plausibly suggesting that Apple ever had any plan or intent to develop its own payment network or was ever positioned to do so. Apple's agreement not to compete with the Entrenched Networks is a horizontal market allocation agreement, and the *per se* analysis applies.

## IV. THE PLAINTIFFS HAVE ALLEGED DIRECT EVIDENCE OF AGREEMENTS (AND IN THE CASE OF VISA, AN UNLAWFUL AGREEMENT).

The Defendants argue that, so long as the PPAs stop short of explicitly memorializing a horizontal market division, then they *cannot contain any direct evidence* of a conspiracy. Even if the PPAs leave some portion of the Defendants' agreements to be discovered, they nonetheless contain substantial direct evidence of an anticompetitive agreement, that strengthens the plausibility of the Plaintiffs' conspiracy allegations.

---

[49] Compl. ¶ 118, *United States v. Visa Inc., supra* note 7. Because the DOJ's complaint focuses on Visa's monopolization of the debit-card market, it was not necessary to elaborate on the extent of Apple's plans to enter the credit-card market.

[50] *Id.*

Unlike in a Section 1 case involving agreements secretively hatched in a "smoke-filled room," the PPAs reveal key portions of the unlawful conspiracy that the Plaintiffs allege. Namely the PPAs establish that: (1) there was a meeting of the minds between Visa and Apple; (2) there was a meeting of the minds between Mastercard and Apple; (3) Apple received per-transaction payments—" ████████████████████ ████████████████████████████████ "[51] ████████ ████████████████████████████████████████████ and (4) in the case of Visa, ████████████████████████████ ████████[52]

Read together, these provisions reveal that so long as Apple upholds its end of the bargain ─ ████████████████████████████████ ████████████████████████[3] This contractual right is worth hundreds of millions of dollars per year.[54] ████████████ ████████████████████████████ t is irrelevant that Visa may *choose to* continue payments to Apple because Apple can no longer enforce Visa's obligation to do so. This is a classic *quid pro quo* and it is direct evidence of an unlawful agreement between Visa and Apple. *See Refco Group Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13 CIV. 1654(RA), 2014 WL 2610608, at *25 (S.D.N.Y. Jun. 10, 2014)

---

[51] Visa/MC Mem., Ex. 1, Schedule A § 10(a)-(b).

[52] *Id.*, Ex. 1 § 10.2.3.

[53] *See id.*, Ex. 1 § 10.2.3, Schedule A § 10(a)-(b).

[54] *See* Am. Compl. ¶¶ 4, 58.

("The right to receive payments in the future is valuable . . . ."); *In re Virginia Foundry Co., Inc.*, 9 B.R. 493, 498 (W.D. Va. 1981).

While the Mastercard PPA does not explicitly condition Mastercard's performance on ███████████████████████ this sort of provision is obviated by its inclusion in the Visa PPA. ████████████████████████

████████████████████████████████████████████

████████████ Apple knew that if it were to enter the Relevant Market to compete with the Entrenched Networks, it would stand to lose hundreds of millions of dollars per year in transaction fees. And as detailed below, the Plaintiffs have alleged substantial circumstantial evidence that the Mastercard-Apple agreement was broader than what the parties reduced to writing.

## V. THE PLAINTIFFS HAVE PLEADED AMPLE CIRCUMSTANTIAL EVIDENCE THAT APPLE ILLEGALLY AGREED WITH VISA AND MASTERCARD TO STAY OUT OF THE RELEVANT MARKET.

### A. The Defendants took similar actions at approximately the same time.

Visa and Mastercard argue that the Plaintiffs have failed to allege "parallel conduct and additional factual circumstances or 'plus factors,' that are indicative of an agreement." This argument fails because the Defendants misapply the "plus factors" analysis, which originates in traditional horizontal price-fixing cases where a plaintiff must infer that the defendants agreed on a price by examining their "parallel conduct" (*e.g.*, contemporaneous price increases) to determine whether it was a result of concerted action or outside forces acting on competitors in an identical manner. The "plus factors" in this test strengthen the plausibility the price increases did not result

from unilateral decisions by the defendants. *See Todd v. Exxon Corp.*, 275 F. Supp. 191, 198 (2d Cir. 2001). The Complaint therefore does not use the term "parallel conduct" because this action is not a price-fixing action. Nonetheless, the Plaintiffs have clearly alleged that Visa and Mastercard took similar actions (*i.e.*, bringing the anticompetitive scheme to Apple, culminating in the PPAs) at approximately the same time (*i.e.*, in August 2014),[55] and that the PPAs contained materially similar terms, which courts consider to constitute "parallel conduct." *See Twombly*, 550 U.S. at 556 n.4; *Markson v. CRST International, Inc.*, No. 517-cv-01261-VAP-SPx, 2019 WL 6354400, at *4 (C.D. Cal. Mar. 7, 2019) (citing *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) ("[P]arallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions . . . constitute[s] circumstantial evidence of anticompetitive behavior.")).

**B.    Circumstantial evidence — including well-recognized "plus factors" supports the inference of illegal conduct.**

"Circumstantial evidence can establish an antitrust conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d at 629 (citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)). And courts may infer the existence of an agreement based on circumstantial evidence. *See Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704 (1969); *see also Twombly*, 550 U.S. at 553; *Tiz, Inc. v. Southern Glazer's Wine & Spirits, LLC*, No. 22 CV 1648, 2024 WL 2785142, at *16 (N.D. Ill. May 30, 2024). In the context of market division (*i.e.*, market allocation), the fact that Apple dropped its

---

[55] *See* Am. Compl. ¶¶ 4-6, 61-62.

plan of entering into the Relevant Market is evidence that Defendants have agreed to divide the Relevant Market. *See, e.g., Arth Main Street Drugs, Inc. v. Beer Distribs. of Indiana, Inc.*, No. F 77-73, 1984 WL 19606, at *6 (N.D. Ind. Nov. 27, 1984) ("Many antitrust decisions involving Section 1 violations are, as here, based on some direct evidence of an agreement . . . backed by circumstantial evidence, such as the fact that . . . members were behaving in a territorial fashion and seemingly avoiding competition.")

As detailed in Section IV, the PPAs are direct evidence that an agreement has occurred. They are also circumstantial evidence of the unlawful market allocation agreement.

Noting that the PPAs "are silent regarding NFC access," and other unlawful restraints alleged in the Amended Complaint,[56] the Defendants frame the PPAs as offering conclusive proof that these restraints do not exist. But does the fact that a restraint is not reduced to writing mean that it does not exist? Of course not, as the Eighth Circuit aptly put, because,

> [t]he crucial factual question [is][w]hat are the terms of the allegedly anticompetitive agreement? Perhaps there are aspiring monopolists foolish enough to reduce their entire anticompetitive agreement to writing, which would make the answer easy. But most would-be monopolists probably can be expected to display a bit more guile, jotting down only a few seemingly common terms while sealing their true anticompetitive agreement with a knowing nod and wink. . . [T]his is not a contracts case in which the scope of the alleged anticompetitive agreement is cabined by the four corners of the written document.

---

[56] Visa/MC Mem. at 15.

*In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014).

The Defendants also confusingly argue that, because the DOJ and the European Commission have been investigating Apple's restriction of access to the iPhone NFC functionality for third-party payment developers as violations of Section 2 of the Sherman Act and its EU equivalent,[57] this necessarily means that Apple's throttling of the NFC functionality is "unilateral" action that was not taken at the behest of or in coordination with the Entrenched Networks.[58] But the Plaintiffs do not allege the NFC restriction by itself constitutes a Section 1 violation of the Sherman Act. Instead, it is part of the anticompetitive scheme among the Defendants to prevent new entrants to the Relevant Market. By blocking access to the iPhone NFC antenna, Apple guaranteed Visa and Mastercard that no other Mobile Wallets can leverage its iPhone user base and connection to merchant terminals to develop an alternative payment system. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 983 (2007) (observing that vertical restraints may be used to facilitate a horizontal agreement).

Moreover, even though this case differs from a "typical" Section 1 price-fixing case, many of the "plus factors" that courts recognize in those cases are also present here.

*First*, actions contrary to defendants' self-interest may serve as evidence of a conspiracy. *See LifeWatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018); *In*

---

[57] EC Treaty art. 82 (as in effect 2008) (now TFEU art. 102).

[58] Visa/MC Mem. at 17 n.8.

*re Local TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *37 (N.D. Ill. Nov. 6, 2020). Here, the Plaintiffs allege that, absent the unlawful agreement, it would be against Apple's self-interest to disallow bank-funded transfers to Apple Cash on Apple Pay, and to restrict other Mobile Wallets' access to the iPhone's NFC functionality, as these restrictions diminish the value of the iPhone. The Plaintiffs bolster this allegation by noting that, in other scenarios where Apple is *not* being paid to restrict competition, it readily allows third-party developers to access Apple's proprietary hardware and software (*e.g.,* consumers can ask iPhone's "Siri" to "Play Taylor Swift on Spotify"), even when they compete with Apple services (*e.g.,* Apple's subscription-based music-streaming service).[59] In those cases, Apple *allows* third-party apps to access the iPhone's proprietary hardware and software because consumers desire a device with multiple options for its ancillary services.[60] Consumers have those same desires with respect to POS Transaction payments, but the Defendants have agreed to prohibit third-party payment developers from using the iPhone's NFC functionality in order to insulate their stranglehold on the Relevant Market from would-be competitors.

*Second*, defendants' opportunity to conspire may serve as circumstantial evidence of a conspiracy. *See In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2004 WL 7200711, at *3 (E.D. Pa. Oct. 29, 2004). The Plaintiffs allege that the Defendants

---

[59] *See* Am. Compl. ¶¶ 78, 87-88.

[60] *See id.*

20

engaged in extensive discussions to concoct, and to renew in 2017 and 2020, their conspiracy to divide the Relevant Market.[61] The Defendants cannot seriously dispute this. The PPAs themselves are 95 (Mastercard) and 125 (Visa) pages long. The Defendants clearly had multiple discussions, extending over a long period of time, that would have given them plenty of opportunity to arrive at an unlawful agreement "with a knowing nod and wink." *See Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d at 734. The Wall Street Journal confirms that Visa and Mastercard had direct communications with each other, including an emergency meeting in a Midtown Manhattan law office where Visa and Mastercard executives met to figure out how to avoid disintermediation by Apple.[62]

*Third*, "[i]n a concentrated market . . . a court should carefully scrutinize firms to see if their conduct or any communication among them supports or requires a finding of conspiracy." *Gainesville Utilities Dep't. v. Florida Power & Light Co.*, 573 F.2d 292, 303 (5th Cir. 1978); *see also Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, No. 22-15231, 2023 WL 4677017, at *4 (9th Cir. Jul. 21, 2023); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323-24 (2d Cir. 2010). Indeed, there are only four Entrenched Networks,

---

[61] *See id.* ¶¶ 57-63.

[62] AnnaMaria Andriotis, *Visa Wanted a Vast Empire. First, It Had to Beat Back Its Foes*, Wall St. J., (Oct. 19, 2024), https://www.wsj.com/finance/banking/visa-wanted-a-vast-empire-first-it-had-to-beat-back-its-foes-3b3067f3. This WSJ article was published after the filing of the Amended Complaint.

two of which are Defendants, who have also already been determined to have significant market power, a finding that was confirmed as recently as this year.[63]

*Fourth*, defendants' history of anticompetitive conduct represents another type of circumstantial evidence of a conspiracy. *See Amarel v. Connell,* 102 F.3d 1494, 1503 (9th Cir. 1996), *as amended* (Jan. 15, 1997). It would be hard to imagine companies with longer histories of anticompetitive conduct than these Defendants.

For example, Visa and Mastercard paid over $3 billion to resolve claims that they "used their power in the credit card market to force merchants to accept an artificially-inflated transaction fee when accepting payment from consumers using debit cards operated by Visa or MasterCard." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 101 (2d Cir. 2005). And in *United States v. Visa U.S.A., Inc.,* 344 F.3d 229, 234, 238-40 (2d Cir. 2003), Visa and Mastercard were found to have held market power in the Network Services market for general purpose cards, and to have violated the Sherman Act "by enacting and enforcing 'exclusionary rules,' which prohibit their member banks from issuing American Express . . . or Discover cards (Count II)." Then, in *United States v. American Express Co.,* No. 1:10-cv-04496-NGG-RER (E.D.N.Y.), the DOJ and several state attorneys general sued Visa, Mastercard, and American Express regarding their anti-steering restraints under Section 1 of the Sherman Act, leading to Visa and Mastercard

---

[63] *United States v. Visa U.S.A., Inc.,* 344 F.3d 229, 239 (2d Cir. 2003); *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.,* 714 F. Supp. 3d 65, 76 n.4, 97-98 (E.D.N.Y. 2024) (denying summary judgment on Mastercard's market power, and recognizing that "no party has moved for summary judgment based on Visa's lack of market power"); *cf.* Compl. ¶¶ 193-97, *United States v. Visa Inc., supra* note 7.

agreeing to remove or revise the challenged restraints.[64] Visa and Mastercard are currently defendants in *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, No. 1:05-md-01720-MKB-JAM (E.D.N.Y.), in which the defendants paid over $6 billion to resolve allegations that they collusively set interchange fees for card payments, and face trial on several opt-out plaintiffs' monetary claims as well as on class claims for injunctive relief.[65] Further, as already discussed, the DOJ is once again suing Visa for anticompetitive conduct, including its unlawful market division practices in collusion with Apple.[66]

*Fifth*, the pendency of related government investigations serves as circumstantial evidence of conspiracy, and Visa and Apple are currently subject to such investigations. *See Starr*, 592 F.3d at 319, 324; *Barry's Cut Rate Stores, Inc. v. Visa, Inc.*, No. 05-MD-1720 (MKB) (JO), 2019 WL 7584728, at *32 (E.D.N.Y. Nov. 20, 2019). Here, not only is the DOJ investigating, but it has actually filed a lawsuit against Visa for, among other actions, market division with Apple.[67] And as the DOJ complaint explains, Apple also recently proposed and consented to certain binding commitments following a European Commission investigation into its potential violations of European competition rules, specifically regarding Apple's restrictions on rivals' use of the iPhone's NFC

---

[64] *United States v. American Express Co.*, 88 F. Supp. 3d 143, 149 (E.D.N.Y. 2015).

[65] *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 330 F.R.D. 11, 18, 53 (E.D.N.Y. 2019).

[66] Compl. ¶¶ 133-37, *United States v. Visa Inc.*, *supra* note 7.

[67] *Id.* ¶¶ 135-136.

functionality and its refusal to allow them access to Apple Pay.[68] In addition, the

Australian Competition and Consumer Commission launched a formal investigation

into Apple's NFC restrictions in September 2021.[69]

## VI.     THE PLAINTIFFS HAVE ANTITRUST STANDING.

Apple argues that the Plaintiffs lack standing because "their theory of injury rests

on an impermissibly and highly speculative causal chain" dependent on "uncertain

links."[70] But none of its arguments break the causal chain between the Defendants'

conduct and the Plaintiffs' injury.

Apple's lead argument—that the Plaintiff Merchants lack antitrust standing

because they do not pay interchange fees directly to the Defendants—contradicts what

Plaintiffs allege in the Complaint.[71] The Plaintiffs specifically allege they "paid and

continue to pay artificially inflated fees directly to the Entrenched Networks . . . for

using their POS Transaction Payment networks."[72] At the motion to dismiss stage, the

Plaintiffs' factual allegations should be taken as true. Even at the summary-judgment

stage, courts routinely reject antitrust-standing challenges in similar cases. *See, e.g., In re*

---

[68] *See* Am. Compl. ¶¶ 100-107; European Commission, Press Release IP/20/1075, Antitrust: Commission Opens Investigation into Apple Practices Regarding Apple Pay (June 15, 2020), https://ec.europa.eu/commission/presscorner/detail/en/ip_20_1075.

[69] James Eyers, *ACCC investigating Apple Pay restrictions on banks*, Fin. Rev., (Sept. 13, 2021), https://www.afr.com/companies/financial-services/accc-investigating-apple-pay-restrictions-on-banks-20210910-p58qi6.

[70] Apple Mem. at 19.

[71] Of course, with respect to Apple, the Plaintiffs cannot pay it because it has agreed not to enter the market.

[72] Am. Compl. ¶ 123.

*Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 1:05-md-01720-MKB-JAM, 2024 WL 1556931, at *10 (E.D.N.Y. Apr. 10, 2024) (denying summary judgment on Visa and Mastercard's "indirect payer" standing arguments); *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-cv-5238 (JG), 2003 WL 1712568, at *6 (E.D.N.Y. Apr. 1, 2003) ("Merchants are direct consumers of the defendants' debit cards services and are directly injured by their allegedly anticompetitive conduct."). In a decision springing out of the *In re Payment Card* litigation mentioned above, the court found that the very same interchange and network fees at issue here were a component of the price plaintiff merchants paid for card acceptance services. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* (*Interchange Fees V*), No. 1:05-md-01720-MKB-JAM, 2024 WL 1014159, at *11 (E.D.N.Y. Mar. 8, 2024). The court highlighted that the product being purchased was not a good but a *service*, and thus discounted the importance of the intermediary — the acquirers — in the transaction. The court explained that the intermediary (the acquirers) facilitate the service without being a purchaser of the service.[73] This same analysis applies here.[74]

---

[73]
    *Interchange Fees V* at *11 ("A service, unlike a tangible (*e.g.*, concrete block) or intangible good (*e.g.*, an app), is not generally susceptible to being resold, because a service like a transaction is 'consume[d]' at the time of its purchase and, once consumed, cannot be re-used or re-sold.") (alteration in original).

[74]
    Even more recently, this analysis was relied on in rejecting a virtually identical standing argument in another case involving a class of merchants purchasing card processing services. *See B&R Supermarket, Inc. v. Visa, Inc.*, No. 17-cv-2738, 2024 WL 4334075, at *3-6 (E.D.N.Y. Sept. 27, 2024).

Apple next challenges the allegation that it would have built its own alternative payment network as too speculative for such an "enormous investment."[75] But as set forth in Sections I and III above, the Complaint sets out how Apple was uniquely positioned to enter the market and had taken concrete steps to do so.[76] But instead of taking the final steps to develop its own network, Apple agreed to let Visa and Mastercard keep that market to themselves in exchange for "a very large and ongoing cash bribe" from Visa and Mastercard.[77]

Unlike the story Apple fabricates in its motion to dismiss, Visa clearly did not think that Apple's ability to enter the market was "speculative." According to the DOJ's complaint, Visa "feared" Apple would develop its own payment network and knew that Apple had "approached a large debit issuer about building a network without Visa or Mastercard."[78] Due to this fear, Visa struck the deal at issue in this case.[79]

Apple expresses disbelief that its entrance into the payment market would have reduced merchant fees.[80] But its views contravene the most axiomatic principles of economics and the very foundation of the public policy behind enforcement of the antitrust laws that the entrance of a competitive market participant reduces prices. *See e.g.*, *FTC v. Actavis, Inc.*, 570 U.S. 136, 146 (2013) (discussing the anticompetitive

---

[75] Apple Mem. at 19.

[76] Am. Compl. ¶ 64; *see also* Compl. ¶¶ 14-16, *United States v. Visa, Inc., supra* note 7.

[77] Am. Compl. ¶ 58.

[78] Compl. ¶ 118, *United States v. Visa Inc., supra* note 7.

[79] *Id.* at ¶ 136.

[80] Apple Mem. at 19-20.

consequences of agreements to not enter the market and that "antitrust laws typically prohibit agreements where one company pays a potential competitor not to enter the market").

*Bakay v. Apple Inc.,* No. 24-cv-00476-RS, 2024 WL 3381034 (N.D. Cal. July 11, 2024)—relied on heavily by Apple—is inapposite. Crucial to the *Bakay* court's standing analysis was that the alleged injury occurred in a market separate and distinct from the market where "competition [was] allegedly being restrained." *Id.* at 7. That critical distinction is absent here where the Plaintiffs' injury occurs in the same market that is being restrained; the market for POS Transaction Payment networks.

Finally, Apple's antitrust-standing challenge attacks only a single component of the analysis, and that analysis is not dispositive. Although Apple acknowledged that whether a plaintiff has antitrust standing is a *multifactor* analysis,[81] it challenges *only* the first AGC factor—the causal link between the antitrust violation and the harm to Plaintiffs. As described above, the Plaintiffs have sufficiently alleged a direct causal connection between their injury and the Defendants' unlawful agreement, and none of Apple's arguments sever the direct causal connection. Apple is also incorrect that this single factor is dispositive of the entire antitrust standing analysis. *See Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 930 (7th Cir. 1995) ("no single [AGC] factor is conclusive") (citing *Bodie–Rickett & Associates v. Mars, Inc.*, 957 F.2d 287, 290 (6th Cir. 1992)); *Serfecz v. Jewel Food Stores, Inc.*, No. 92 C 4171, 1994 WL 478576, at \*2 (N.D. Ill.

---

[81] *See Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983) ("AGC"); Apple Mem. at 18-20.

Aug. 31, 1994), *aff'd sub nom. Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995) ("It is important to note at the outset that no single [*AGC*] factor is decisive; rather, the court must balance all of the factors).[82]

## VII. THE COURT SHOULD GRANT LEAVE TO AMEND IF IT GRANTS ANY PORTION OF THE MOTION TO DISMISS.

If the Court grants any portion of the Defendants' motion to dismiss, then it should grant the Plaintiffs leave to amend. Fed. R. Civ. P. 15(a)(2) provides that district courts "should freely give leave [to amend] when justice so requires." District courts may deny leave to amend where there is "futility, undue delay, prejudice, or bad faith." *R3 Composites Corp. v. G&S Sales Corp.*, 960 F.3d 935, 946 (7th Cir. 2020). Further, "[t]he Supreme Court has interpreted this rule to require a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend." *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 310 (7th Cir. 2018); *see also Runnion v. Girl Scouts of Greater Chicago & N.W. Ind.*, 786 F.3d 510, 519-20 (7th Cir. 2015) (collecting cases, and stating "giving leave to amend is 'especially advisable when such permission is sought after the dismissal of the first complaint'"). Leave to amend would be particularly appropriate in this case, as it would allow the Plaintiffs to supplement the Complaint with factual matter revealed in the DOJ action

---

[82] Defendants completely ignore—and do not contest—the remaining five AGC factors. By failing to address the five remaining *AGC* Factors, Defendants concede that these factors favor Plaintiffs. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("where a party fails to develop arguments related to a discrete issue" that party waives the arguments).

against Visa and in the discovery which this Court ordered could proceed, notwithstanding the Defendants' motions to dismiss.

## VIII.  CONCLUSION

Without the benefit of discovery, the Plaintiffs have alleged all of the hallmarks of a horizontal market division—a well-funded and motivated potential entrant, incumbent firms at risk of losing their dominance, and handsome payments to the entrant to preserve the status quo. The Defendants may dispute the Plaintiffs' allegations, but those disagreements do not render those allegations implausible. This Court should therefore deny the motions to dismiss and allow the case to proceed.

Dated: November 7, 2024

Respectfully submitted,

*/s/ Ryan W. Marth*
K. Craig Wildfang
Thomas J. Undlin
Stacey P. Slaughter
Ryan W. Marth
Geoffrey H. Kozen
Navy A. Thompson
Caitlin E. Keiper
**ROBINS KAPLAN LLP**
800 Lasalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
kcwildfang@RobinsKaplan.com
tundlin@RobinsKaplan.com
sslaughter@RobinsKaplan.com
rmarth@RobinsKaplan.com
gkozen@RobinsKaplan.com
nthompson@RobinsKaplan.com
ckeiper@RobinsKaplan.com

Stephen M. Tillery (Ill. Bar No. 2834995)
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
stillery@koreintillery.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5620
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

Marc Wallenstein
**KOREIN TILLERY LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 899-5065
mwallenstein@koreintillery.com

Robin A. van der Meulen
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
rvandermeulen@scott-scott.com

Patrick J. McGahan
Peter Cherepanov
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
pmcgahan@scott-scott.com
pcherepanov@scott-scott.com

Sean Russell
Jonathan Smallwood
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
srussell@scott-scott.com
jsmallwood@scott-scott.com

Amelia F. Burroughs
**BURROUGHS LEGAL**
P.O. Box 1154
Ferndale, CA 95536
Telephone: (707) 786-3955
amelia@burroughslegal.com

Michelle J. Looby
Abou B. Amara, Jr.
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
mlooby@gustafsongluek.com
aamara@gustafsongluek.com

*Attorneys for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2025, I caused a true and correct copy of the foregoing to be served on Defendants' counsel of record electronically via CM/ECF.

Respectfully submitted,

*/s/ Ryan W. Marth*
Ryan W. Marth