## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

MIRAGE WINE + SPIRIT'S, INC., d/b/a
MIRAGE WINE & SPIRITS, MARTLET
MEADOWS FARM, LLC, d/b/a
DOUBLE BUBBLE CAR WASH,
PARCELLE LLC, d/b/a PARCELLE
ORGANICS, FOGGY BOTTOM BOYS,
LLC, and FAMILIA COFFEE,
Individually and on Behalf of All
Others Similarly Situated,

                **Plaintiffs,**

      v.

APPLE INC., VISA INC., and
MASTERCARD INCORPORATED,

                **Defendants.**

**Case No. 3:23-cv-3942-DWD**

## MEMORANDUM & ORDER

Before the Court is the Motion to Dismiss of Defendants Visa Inc. ("Visa") and Mastercard Incorporated ("Mastercard"). (Doc. 115; Sealed Doc. 116). Also before the Court is the Motion to Dismiss of Defendant Apple Inc. ("Apple"). (Doc. 119; Sealed Doc. 120). Plaintiffs filed a combined Response to, and Defendants filed separate Replies in Support of, the Motions to Dismiss. (Docs. 158, 160, 161, 175; Sealed Docs. 154, 157, 159, 163). As explained below, the Motions to Dismiss are **GRANTED in part** and **DENIED in part**.[1] The Amended Class Action Complaint is **DISMISSED without prejudice**. Plaintiffs shall file a Second Amended Class Action Complaint, if any, within 30 days.

---

[1]The Motions to Dismiss are denied only to the extent that they request a dismissal with prejudice.

# I. BACKGROUND

In an Amended Class Action Complaint, Plaintiffs allege Defendants Visa and Mastercard have "dominated the U.S. market for Point-of-Sale ('POS') Payment Card Network Services since the 1960s." (Doc. 101, pgs. 4, 10-14).[2] Due to that dominance, Defendants Visa and Mastercard have "long imposed inflated fees on Merchants for use of their POS Transaction Payment networks, and U.S. Merchants have paid fees that significantly exceed fees charged in other jurisdictions." (Doc. 101, pgs. 4, 40-43). Defendant Apple, with its iPhone and Apple Pay, allegedly could have disrupted that dominance and restored competition to the relevant market. (Doc. 101, pgs. 4, 15-20, 31-34). Defendants Visa and Mastercard "worried that Apple and its iPhone would disrupt…their longstanding POS Transaction Payment networks by driving down the lucrative fees…charged [to] Merchants for decades." (Doc. 101, pgs. 4, 20-21, 31-34).

However, rather than compete in the market with lower fees, Defendant Apple allegedly agreed with Defendants Visa and Mastercard to allocate the market. (Doc. 101, pgs. 4-5, 21-31). More specifically, Defendant Apple allegedly agreed to not establish its own payment network, to prevent Apple Pay users from transferring funds from their bank accounts directly to merchants' bank accounts, and to protect Defendants Visa and Mastercard's payment networks by blocking competitors' access to Apple Wallet and its Near Field Communication ("NFC") technology.[3] (Doc. 101, pgs. 4-5, 21-31). In exchange,

---

[2]Each Plaintiff used Apple Pay as a method of purchasing network services from Defendants Visa and Mastercard at the physical POS. (Doc. 101, pgs. 7-8).

[3]The NFC technology is described as "a wireless technology that enables the communication between devices over short distances." (Sealed Docs. 116-1, pg. 7; 116-2, pg. 7; 120-1, pg. 7; 120-2, pg. 7).

Defendants allegedly agreed that Apple Pay transactions would run through Defendants Visa and Mastercard's payment networks and Defendant Apple would receive portions of the transaction fees, or "cash bribes," generated by the payment networks. (Doc. 101, pgs. 4-5, 22-31). Plaintiffs describe the fees, or "cash bribes," as follows: "the Entrenched Networks arranged for Apple to be paid 15 basis points (*i.e.*, 0.15%) on the value of all U.S. credit transactions and 0.5 cents ($0.005) on all U.S. debit transactions initiated with Apple Pay at the POS on their respective networks." (Doc. 101, pgs. 5, 22). Plaintiffs allege the "payments initially amounted to hundreds of millions of dollars each year and are now worth billions of dollars each year." (Doc. 101, pgs. 5, 22).

As a result of Defendants' unlawful actions, Plaintiffs allegedly "sustained direct injury to their businesses or property," *i.e.*, they "paid and continue to pay artificially inflated fees directly to the Entrenched Networks (Apple's conspirators) for using their POS Transaction Payment networks, and Apple has received a portion of those fees as a bribe." (Doc. 101, pg. 43). They claim *per se* violations of the Sherman Act (15 U.S.C. § 1) and the Clayton Act (15 U.S.C. §§ 15 and 26) on behalf of themselves and a class "consisting of Merchants in the United States that used Apple Pay as a method of purchasing Network Services from Visa and Mastercard at the physical POS from December 14, 2019, to the present…and who did not accept Visa or Mastercard Payment Cards…at any time between January 1, 2004 and January 25, 2019, and have not otherwise released the claims asserted in the[] [Amended] Complaint." (Doc. 101, pgs. 5-7, 31, 46-51). Plaintiffs seek monetary relief stemming from the inflated fees that were paid due to

Defendants' "unlawful agreement to restrain trade," including treble damages, costs, and attorney fees. (Doc. 101, pg. 6). Plaintiffs also request injunctive relief. (Doc. 101, pg. 6).

Defendants filed their Motions to Dismiss the Amended Class Action Complaint under Federal Rule of Civil Procedure 12(b)(6). (Docs. 115 & 119; Sealed Docs. 116 & 120). The Court addresses the arguments raised in relation to those Motions to Dismiss below.

## II. ANALYSIS

A motion to dismiss under Rule 12(b)(6) challenges a complaint for the failure to state a claim for which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)). To survive such a motion, which tests the sufficiency of the complaint but not its merits, a plaintiff must allege enough facts to state a facially plausible claim to relief. *Kloss v. Acuant, Inc.*, 462 F. Supp. 3d 873, 876 (7th Cir. 2020) (quoting *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 878 (7th Cir. 2012)); *Fosnight v. Jones*, 41 F.4th 916, 921-22 (7th Cir. 2022) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That means the plaintiff must plead enough facts for the Court to draw reasonable inferences as to liability. *Fosnight*, 41 F.4th at 922 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint need not allege "detailed factual allegations," but it must state enough facts to lift the claim above the speculative level. *Kloss*, 462 F. Supp. 3d at 876 (citing *Twombly*, 550 U.S. at 555). "Threadbare recitals" of the elements, supported by mere conclusions, do not suffice. *Trivedi v. Wells Fargo Bank, N.A.*, 609 F. Supp. 3d 628, 631 (N.D. Ill. 2022) (quoting *Iqbal*, 556 U.S. at 678). When ruling, the Court accepts all well-

pled facts as true and draws all reasonable inferences for the plaintiff. *Id.* (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)); *accord Kloss*, 462 F. Supp. 3d at 874-75.

The documents attached to a motion to dismiss may be considered by the Court if they are referenced in the plaintiff's complaint and are central to its claims, all of which is true regarding Plaintiffs' Amended Class Action Complaint and Defendants' Payment Platform Agreements ("PPAs") here. *Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 543 (7th Cir. 2022) (citing *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002)); (Sealed Docs. 116-1, 116-2, 120-1, 120-2). And, when an exhibit attached to or referenced in the complaint "incontrovertibly contradicts" the plaintiff's allegations, it is "the exhibit [that] ordinarily controls, even when considering a motion to dismiss." *See Esco v. City of Chicago*, 107 F.4th 673, 678-79 (7th Cir. 2024) (quoting *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013)) (cleaned up). The Court is not required to accept the plaintiff's allegations on the effect of the exhibit; instead, it can independently examine and form its own conclusions about the proper construction and meaning of that exhibit. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) (citing 5 Wright & Miller, *Federal Practice & Procedure: Civil 2d,* § 1327 at 766 (1990)).

### A. Section 1 of the Sherman Act and Antitrust Standing

As a substantive matter, the Sherman Act "is designed 'to protect consumers from injury that results from diminished competition.' " *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (quoting *Agnew v. NCAA*, 683 F.3d 328, 334-35 (7th Cir. 2012)). To that end, § 1 of the Sherman Act provides as follows:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

To succeed on a claim under § 1, a plaintiff must plead and prove: (1) a contract, combination, or conspiracy; (2) an unreasonable restraint of trade in a relevant market; and (3) an accompanying injury. *Always Towing & Recovery, Inc.*, 2 F.4th at 703 (quoting *Agnew*, 683 F.3d at 335); *accord In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 983 (N.D. Ill. 2022). The failure to satisfy any one of these elements is fatal to a § 1 claim. *Always Towing & Recovery, Inc.*, 2 F.4th at 704 (quoting *Agnew*, 683 F.3d at 335).

As to the first element, to survive a Rule 12(b)(6) motion to dismiss, "the existence of an agreement that violates § 1 of the Sherman Act [must] 'be pleaded plausible through allegations of fact.' " *Id*. at 703 (quoting *Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019)); *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018) ("Plausibly pleading the first element, an agreement, requires 'enough factual matter (taken as true) to suggest that an agreement was made' — that is, 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.' "). A plaintiff can do this with two types of allegations: (1) direct allegations of an agreement, *e.g.*, the admission to a conspiracy; or (2) circumstantial allegations of an agreement, *e.g.*, facts giving rise to a plausible

6

inference as to the existence of an agreement. *Always Towing & Recovery, Inc.*, 2 F.4th at

703 (quoting *Alarm Detection Sys., Inc.*, 930 F.3d at 827); *accord In re Dealer Mgmt. Sys.*

*Antitrust Litig.*, 313 F. Supp. 3d at 949. If the allegations are as consistent with a wide

range of lawful and independent business conduct as they are with an anticompetitive

agreement, then the first element of § 1 is not satisfied. *See In re Outpatient Med. Ctr. Emp.*

*Antitrust Litig.*, 630 F. Supp. 3d at 984; *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, 313

F. Supp. 3d at 949 ("Mere allegations of 'parallel conduct,' without more, do not 'tend[]

to exclude the possibility of independent action,' and are therefore insufficient.").

Similarly, to plead a conspiracy on the first element of a § 1 claim, a plaintiff must

allege each conspirator had a conscious commitment to a common scheme that was

designed to achieve an unlawful objective, *i.e.*, a unity of purpose, a common design and

understanding, or a meeting of the minds in an unlawful arrangement. *See In re Outpatient*

*Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 984 (quoting *Omnicare, Inc. v.*

*UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011); citing *Standard Iron Works v.*

*ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009)); *accord In re Dealer Mgmt. Sys.*

*Antitrust Litig.*, 581 F. Supp. 3d 1029, 1047 (N.D. Ill. 2022). Multiple bilateral agreements

can evince a single conspiracy if they are sufficiently interdependent and are executed in

the context of other plus factors that suggest coordination. *In re Outpatient Med. Ctr. Emp.*

*Antitrust Litig.*, 630 F. Supp. 3d at 985 (quoting *In re Nexium (Esomeprazole) Antitrust Litig.*,

42 F. Supp. 3d 231, 252 (D. Mass. 2014)); *see also In re Turkey Antitrust Litig.*, 642 F. Supp.

3d 711, 722 (7th Cir. 2022) ("In considering whether sufficient circumstantial evidence of

collusion exists at the pleading stage, the Court asks whether Plaintiffs alleged parallel

conduct and additional factual circumstances or 'plus factors,' that are indicative of an agreement."). The relevant "plus factors" include the common motive to conspire, evidence showing parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications. *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 985 (quoting *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 334 (S.D.N.Y. 2021)); *see also In re Turkey Antitrust Litig.*, 642 F. Supp. 3d at 722 ("Sufficient circumstantial evidence may include 'a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion.' Parallel behaviors include those which 'would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties,' and 'conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement.' ") (cleaned up).

As to the second element, the Court stresses "every contract is a restraint of trade, and as [the Supreme Court] ha[s] repeatedly recognized, the Sherman Act was intended to prohibit only unreasonable restraints of trade." *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98 (1984); *accord Always Towing & Recovery, Inc.*, 2 F.4th at 704; *see also In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 984 (noting "§ 1 does not reach independent action that happens to have an anticompetitive effect). To assess whether an agreement is an unreasonable restraint of trade, the Court "draw[s] on several analytical frameworks," including the rule of reason and the *per se* rule. *Always*

*Towing & Recovery, Inc.*, 2 F.4th at 704 (citing *Agnew*, 683 F.3d at 335-37); *accord In re*
*Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 986.[4]

Typically, antitrust claims are analyzed under the rule of reason, which requires a
plaintiff to show the agreement has an anticompetitive effect on a market within a
geographic area. *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 986
(citing *Agnew*, 683 F.3d at 335; *U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 607 (1972)); *accord In*
*re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 633 (N.D. Ill. 2020). Under this rule,
the plaintiff has a threshold burden of defining the precise market, including both its
product and geographic components, in order to show the defendant wields market
power and can produce the anticompetitive effects. *See In re Delta Dental Antitrust Litig.*,
484 F. Supp. 3d at 639-40 (quoting *Agnew*, 683 F.3d at 337; citing *Brown Shoe Co. v. U.S.*,
370 U.S. 294, 324 (1962); *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956));
*Vital Pharm., Inc. v. Berlin Packaging LLC*, 632 F. Supp. 3d 780, 786 (N.D. Ill. 2022).

However, under the *per se* rule, which allows the Court to dispense with the other
rules and is specifically invoked by Plaintiffs here, actions are *per se* violations of § 1 when
their nature and necessary effects are so plainly anticompetitive that it is unnecessary to
analyze their illegality. *Always Towing & Recovery, Inc.*, 2 F.4th at 704 (quoting *Tri-Gen Inc.*
*v. Int'l Union of Operating Eng'rs, Loc. 150*, 433 F.3d 1024, 1032 (7th Cir. 2006)); *accord In re*
*Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 986-87; *see also Agnew*, 683
F.3d at 336 ("[T]he per se rule…is employed when a practice facially appears to be one

---

[4] A third rule, the quick-look rule, is not implicated here. *See Agnew*, 683 F.3d at 336 (discussing that
rule's applicability); *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d at 633 (same).

that would always or almost always tend to restrict competition and decrease output. Restraints that would fall under this category are illegal as a matter of law for reasons of efficiency; in essence, it is simply not worth the effort or resources of a Rule of Reason analysis when the Court can predict with confidence that the Rule of Reason will condemn a restraint…. [A] restraint is deemed unreasonable without any inquiry into the market context in which the restraint operates.") (cleaned up); (Doc. 101, pgs. 5, 25, 28, 31, 50). When a contract, combination, or conspiracy involves such actions, "an unreasonable restraint is conclusively presumed because the probability that these practices are anticompetitive is so high." *Always Towing & Recovery, Inc.*, 2 F.4th at 704 (quoting *Omnicare, Inc.*, 629 F.3d at 705–06; *NCAA*, 468 U.S. at 100); *see also In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 986 ("The *per se* rule is a presumption of unreasonableness based on business certainty and litigation efficiency. It represents a longstanding judgment that the prohibited practices by their nature have a substantial potential for impact on competition…. [A] conclusive presumption of unreasonableness applies where experience with that particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.") (cleaned up).

Usually, it is only horizontal restraints, *i.e.*, restraints imposed pursuant to the agreement of competitors, that are treated as *per se* unreasonable. *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 987 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 540-51 (2018)). For example, it is *per se* unlawful for competitors, at the same level of a market structure, to agree to allocate territories, customers, or products for the purpose of minimizing competition. *See id.* at 987-88 (citing *Leegin Creative Leather Prods., Inc. v.*

*PSKS, Inc.*, 551 U.S. 877, 886 (2007); *U.S. v. Capitol Serv., Inc.*, 568 F. Supp. 134, 154 (E.D. Wis. 1983); *U.S. v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1273 (10th Cir. 2018); quoting *Topco Assocs., Inc.*, 405 U.S. at 608); *see also City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 753 (N.D. Ill. 2019) ("Courts use a 'per se' test for conduct such as horizontal price fixing, market allocation, group boycotts, or tying arrangements that are so inherently anticompetitive, they are considered illegal per se."); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788 (N.D. Ill. 2017) ("As the Seventh Circuit explained, the Sherman Act does not require sellers to compete; it just forbids their agreeing or conspiring not to compete. The crucial question, then, is whether the challenged anticompetitive conduct stems from independent decisions or from an agreement, tacit or express…. [O]nly agreements not to compete are prohibited by the law.") (cleaned up).

However, courts must contrast horizontal restraints, which warrant a *per se* presumption of unreasonableness, with other types of vertical restraints that are "imposed by agreement between firms at different levels of distribution." *See Always Towing & Recovery, Inc.*, 2 F.4th at 705 (citing *Tri-Gen*, 433 F.3d at 1032; *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)) (cleaned up). The Supreme Court has found certain types of vertical restraints are not *per se* unlawful. *Id.* (citing *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 885). With that said, however, the Seventh Circuit has acknowledged it is "cautious about importing relaxed standards of proof from horizontal agreement cases into vertical agreement cases because to do so might harm competition and frustrate the very goals that antitrust law

11

seeks to achieve." *Always Towing & Recovery, Inc.*, 2 F.4th at 705 (quoting *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004)) (cleaned up).

Finally, under the third element of a § 1 claim, a plaintiff must plead an injury of the type intended to be prevented by the antitrust laws and that flows from the unlawful actions. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 950 (quoting *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*, 830 F.2d 1374, 1377 (7th Cir. 1987); citing *U.S. ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 924 (N.D. Ill. 2015)); *see also Rozema v. Marshfield Clinic*, 977 F. Supp. 1362, 1374 (W.D. Wisc. 1997) ("[P]laintiffs alleging market allocation must show that they have suffered an antitrust injury resulting directly from defendants' unlawful conduct."); *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1065 (7th Cir. 2019) ("It's not enough to allege that the injury is merely causally linked to the alleged anticompetitive behavior. [The plaintiff] must also demonstrate that its injury is attributable to an anti-competitive aspect of the practice under scrutiny. In other words, the injury must flow directly from higher prices or lower output, the principal vices proscribed by the antitrust laws.") (cleaned up). As noted above, the Sherman Act protects against injuries from reduced competition. *See Always Towing & Recovery, Inc.*, 2 F.4th at 703 (quoting *Agnew*, 683 F.3d at 334-35).

Even if a plaintiff has an antitrust injury, however, it does not necessarily confer antitrust standing. *See Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995); *see also Fisher v. Aurora Health Care, Inc.*, 558 Fed. App'x 653, 655 (7th Cir. 2014) (noting that, to succeed on his claims, the plaintiff had to establish both an antitrust injury and antitrust standing); *Marion Diagnostic Ctr, LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 345

n. 7 (7th Cir. 2022) ("Antitrust injury and antitrust standing are related but distinct concepts."). By virtue of the antitrust standing requirement, the Sherman Act imposes additional rules for deciding whether a plaintiff may properly bring a private antitrust action. *McGarry & McGarry, LLC*, 937 F.3d at 1063 (quoting *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002)). And, while labeled a form of standing, "antitrust standing" is actually a misnomer. *See id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127-128, n. 4 (2014)). Unlike Article III standing, which "is a necessary requirement for a justiciable case or controversy," antitrust standing concerns which plaintiffs may bring a cause of action. *Id.* (quoting *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003); *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994)); *see also ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 924 (N.D. Ill. 2012) ("Antitrust standing is not jurisdictional."). The general rule is that customers and competitors in an affected market have antitrust standing to bring a cause of action; however, the Seventh Circuit has explained as follows:

> From the class of injured persons suffering an "antitrust injury" only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action…. The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party to perform the office of a private attorney general[,] particularly when denying standing is not likely to leave a significant antitrust violation undetected or unremedied. Our decisions have recognized the need to balance the interests of deterrence through private antitrust enforcement and avoidance of excessive treble damages litigation. An appropriate balance is achieved by granting standing only to those who, as consumers or competitors, suffer immediate injuries with respect to their business or property, while excluding persons whose injuries were more indirectly caused by the antitrust conduct.

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020) (collecting cases); *Serfecz*, 67 F.3d at 598 (quoting *In re Indus. Gas Antitrust Litig.*, 681 F.2d 514, 516, 520 (7th Cir.1982); *Associated Gen. Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 542 (1983)) (cleaned up); *see also McGarry & McGarry, LLC*, 937 F.3d at 1064 ("Because antitrust violations may be expected to cause ripples of harm to flow through the Nation's economy…Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property. Some injuries are too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit.") (cleaned up).

Factors for assessing whether a plaintiff has shown the requisite link between an antitrust violation and an antitrust injury for purposes of antitrust standing include: (1) the causal link between the antitrust violation and antitrust injury; (2) any improper motive; (3) whether the antitrust injury is the type Congress sought to redress; (4) the directness of the antitrust injury and the market restraint; (5) the speculative nature of damages; and (6) the risk of duplicative recoveries or complex damages apportionment. *See McGarry & McGarry, LLC*, 937 F.3d at 1064-65 (citing *Sanner v. Bd. of Trade of Chicago*, 62 F.3d 918, 926–27 (7th Cir. 1995); *Associated Gen. Contractors, Inc.*, 459 U.S. at 537-44); *accord Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 718 (7th Cir. 2006). The former three factors relate to the antitrust injury, and the latter three factors relate to whether the plaintiff can most efficiently vindicate the antitrust laws. *McGarry & McGarry, LLC*, 937 F.3d at 1065 (citing *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555,

14

1563–64 (7th Cir. 1991); *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007); quoting *Serfecz*, 67 F.3d at 598). The factors are not "strict requirements" or "exclusive analytical tools, but they "illustrate the areas of inquiry that may be relevant to a case-specific evaluation of 'the plaintiff's harm, the alleged wrongdoing by the defendant[], and the relationship between them.' " *Id.* (quoting *Associated Gen. Contractors, Inc.*, 459 U.S. at 535); *see also Sanner*, 62 F.3d at 930 ("[N]o single factor is conclusive.").

## B. The Parties' Arguments and the Court's Application of the Legal Authorities

Defendants make similar arguments. They argue the allegations of *per se* unlawful horizontal market allocation agreements are belied by the PPAs. (Sealed Docs. 116, pgs. 5, 9, 12-18; 120, pgs. 7, 14-15). Defendants argue those agreements, on which Plaintiffs' claim "entirely relies," set forth no unreasonable restraint of trade. (Sealed Docs. 116, pgs. 5, 9, 12-18; 120, pgs. 7, 12, 17). Defendants stress that, contrary to Plaintiffs' allegations, the PPAs do not restrain Defendant Apple from creating or acquiring a competing payment network, using direct bank-to-bank transfers as a payment method in Apple Pay, or sharing its NFC technology with third-party application developers. (Sealed Docs. 116, pgs. 14-15, 17, 19; 120, pgs. 6-7, 11, 17-18, 21). Indeed, Defendants argue those issues are absent from, or contradicted by, the PPAs, which were necessary to govern how Defendant Apple could utilize Defendants Visa and Mastercard's "infrastructure to enable Apple Pay users to transact with digital versions of their cards." (Sealed Docs. 116, pgs. 14-15, 17, 19; 120, pgs. 6-7, 11, 17-18, 21). Based on that necessity, Defendants argue the PPAs are vertical distribution agreements. (Sealed Docs. 120, pgs. 14-16; 157, pg. 2).

Further, Defendants argue Plaintiffs failed to allege other facts to support their theory of the case, *e.g.*, other direct evidence of an unlawful agreement or conspiracy or circumstantial evidence thereof in the form of communications, meetings, or other interactions between Defendants. (Sealed Docs. 116, pgs. 6, 12-22; 120, pgs. 7, 18-19). As such, Defendants suggest Plaintiffs' allegations reflect proper unilateral or independent business decisions. (Sealed Docs. 116, pgs. 12, 15, 19-20; 120, pgs. 7, 18). Defendant Apple states: Plaintiffs "offer only the conclusion that Apple acted against its self-interest by building Apple Pay instead of something entirely different—namely, a payment network." (Sealed Doc. 120, pg. 19). In its view, it is unreasonable and "purely speculative" to suggest the "decision to build an entirely new product (Apple Pay) that did not then exist in the marketplace," rather than engage in the "extremely costly, time-consuming, and difficult endeavor" of developing a payment network like those of Defendants Visa and Mastercard, was suspicious, "against its economic self-interest," or anything but the "prudent and economically rational path." (Sealed Doc. 120, pgs. 19-21).

Although Plaintiffs allege fees or "cash bribes" were paid to Defendant Apple by Defendants Mastercard and Visa for its decision not to compete, Defendants argue the fees were "paid not by the defendant networks[] but by payment-card issuing banks that are not defendants." (Sealed Docs. 116, pgs. 6, 8, 21-22; 120, pgs. 21-22). In any event, Defendants argue Plaintiffs failed to plead the fees or "cash bribes" are anything but ordinary compensation for access to the iPhone ecosystem. (Sealed Docs. 116, pgs. 6, 21-22; 120, pgs. 6 n. 1, 21-22). Defendant Apple suggests Apple Pay is free to consumers, merchants, and payment networks, so it is payment-card issuers who are charged

"nominal fee[s] for transactions made using their cards on Apple Pay." (Sealed Doc. 120, pgs. 6, 8). As a result, Defendants state it is "speculative and implausible" that Defendant Apple conspired with Defendants Visa and Mastercard "to stay out of the payment network business," as Plaintiffs mischaracterize "the fees that Apple charges [payment-card] issuers (rather than payment networks, merchants, or customers) as a 'bribe' that the payment networks pay Apple in exchange for a commitment to not build its own payment network." (Sealed Doc. 120, pgs. 6, 21-22) (Emphasis in original omitted.).

Similarly, while the PPAs do not prevent the development of its own payment network, Defendant Apple states it never had a plan, intent, interest, or economic incentive to do so, as "Apple Pay has always been premised on creating digital versions of consumers' existing payment cards for use on Apple's mobile devices in a private and secure way." (Sealed Doc. 120, pgs. 10-11, 15, 17, 21). Defendant Apple states its own payment network would be inconsistent with the vision for and roll-out of Apple Pay. (Sealed Doc. 120, pg. 10). Defendant Apple believes the suggestion it had the potential, or was uniquely situated, to create a payment network is unsupported speculation, stating: Plaintiffs "offer the speculation built on further speculation that, had Apple built its own payment network, millions of customers would have adopted it, as would many thousands of banks—both [payment-card] issuers and [merchant-bank] acquirers—such that Apple would have dethroned and forced the incumbent payment networks to lower the interchange fees applicable to merchant transactions." (Sealed Doc. 120, pgs. 6-7, 10,

15).[5] Defendant Apple argues "pointing to resources or size is insufficient to plead that it was a potential competitor to the payment networks." (Sealed Doc. 120, pgs. 15, 21).

Finally, in light of the "highly speculative injury" asserted in this case, Defendant Apple, but not Defendants Visa or Mastercard, challenges Plaintiffs' antitrust standing. (Sealed Doc. 120, pgs. 7-8, 12-13, 22-25). Defendant Apple explains as follows:

> Plaintiffs allege that merchants suffer from inflated interchange fees set by Visa and Mastercard that the [merchant-bank] acquirers pay to the [payment-card] issuers. According to Plaintiffs, the cost of the allegedly inflated interchange fees paid by the [merchant-bank] acquirers is typically passed on to merchants. Plaintiffs claim these interchange fees would be lower if Apple had not built Apple Pay and instead built and deployed its own payment network capable—in some unspecified way—of forcing the existing payment networks to lower their interchange fees. The inferential causal chain underlying Plaintiffs' antitrust injury theory is too speculative and tenuous to support antitrust standing.

(Sealed Doc. 120, pgs. 7-8, 12-13).

Defendant Apple emphasizes, as is purportedly acknowledged by Plaintiffs, "the derivative and indirect way in which the interchange fees charged by the payment networks are borne by merchants." (Sealed Doc. 120, pg. 23). The merchant-bank acquirers, pursuant to Defendants Visa and Mastercard's rules, pay interchange fees to payment-card issuers on a per-transaction basis before passing the costs associated with those interchange fees along to merchants like Plaintiffs. (Sealed Doc. 120, pgs. 23-24).

---

[5] The PPAs define "issuer" as "an entity that provides Accounts and issues Cards." (Sealed Docs. 116-1, pg. 6; 116-2, pg. 6; 120-1, pg. 6; 120-2, pg. 6). They define "participating issuer" as "a Network Issuer that participates in the Program with a Card under Network's brand." (Sealed Docs. 116-1, pg. 7; 116-2, pg. 8; 120-1, pg. 7; 120-2, pg. 8). "Acquirer" is defined as "a Person licensed by a Payment Network within the Territory having legal arrangements with merchants (i) entitling Cardholders to charge purchases of merchants' goods or services on the Card and (ii) providing for those merchants to transfer the amounts payable for such Charges to such Person[/the Acquirer] for processing on the applicable Payment Network." (Sealed Docs. 116-1, pg. 2; 116-2, pg. 2; 120-1, pg. 2; 120-2, pg. 2).

18

However, Plaintiffs allegedly failed to claim Apple Pay fees were paid directly to Defendant Apple or that Defendant Apple planned or prepared to create a payment network at the time it entered the PPAs with Defendants Visa and Mastercard. (Sealed Doc. 120, pg. 24 n. 10). Defendant Apple argues "Plaintiffs' conjecture about both the pass-on of fees and Apple's ability to build a payment network that would bring about lower fees across the market means that their theory of injury rests on an impermissibly and highly speculative causal chain" with the following "uncertain" links: (1) Defendant Apple would take the necessary steps to invest in and build a competing payment network; (2) Defendant Apple would successfully launch that payment network; (3) the payment network would achieve widespread adoption by merchants, merchant-bank acquirers, payment-card issuers, and customers; (4) the adoption of the payment network would be so widespread, and the market penetration by Defendant Apple would be so successful, that Defendants Visa and Mastercard would face "downward pricing pressure" relative to their interchange fees; and (5) the resultant savings would have been passed on to Plaintiffs from the merchant-bank acquirers. (Sealed Doc. 120, pgs. 24-25).

In response, Plaintiffs note "the United States Department of Justice, which is currently suing Visa for monopolization, [has alleged] Apple…engaged in discussions with a large debit issuer about building a payment network without Visa or Mastercard's involvement." (Sealed Doc. 154, pgs. 9 n. 7, 15-16, 20) (citing *U.S. v. Visa Inc.*, No. 24-cv-7214, Doc. 1, ¶ 118 (S.D. N.Y. Sept. 24, 2024)). Plaintiffs argue it is not necessary to assess the veracity of that allegation, which is subject to judicial notice, at this stage. (Sealed Doc. 154, pg. 9 n. 7). They also stress the allegation that Defendant Apple "branched into the

payments industry in the early 2010s by filing several payments-related patents and by acquiring a number of start-up companies within the payments space," resulting in Apple Pay. (Doc. 101, pg. 19; Sealed Doc. 154, pgs. 9, 20). Defendant Apple allegedly "work[ed]" to partner with PayPal," a competitor to Defendants Visa and Mastercard, on Apple Pay's launch, but "suddenly dropped [that] planned partnership" at Defendants Visa and Mastercard's request. (Doc. 101, pg. 23; Sealed Doc. 154, pgs. 9, 11, 20). The partnership could have allegedly funded Apple Pay with the National Automated Clearinghouse for Electronic Funds Transfers ("ACH"), allowed consumers to connect to their bank accounts, and thereby disintermediated Defendants Visa and Mastercard. (Doc. 101, pgs. 21-22; Sealed Doc. 154, pg. 10). Without the partnership, Defendant Apple "limited Apple Pay to operating as a pass-through Mobile Wallet that merely facilitated payments through the Entrenched Networks, whose payment products were the only ones that could be loaded onto Apple Pay." (Doc. 101, pg. 25; Sealed Doc. 154, pg. 11).

If not for the PPAs, which are allegedly *per se* unlawful horizontal market allocation agreements, Plaintiffs argue it was in Defendant Apple's economic interest to create a payment network, charge lower fees, enable the funding of Mobile Wallets with third-party sources, and allow merchants to accept payment systems like bank-to-bank transfers. (Doc. 101, pgs. 5, 25, 28, 31, 50; Sealed Doc. 154, pgs. 11-12). They argue the Amended Class Action Complaint sufficiently alleges, absent the PPAs and their provision of fees, Defendant Apple had the plan, intent, and ability to develop a payment network. (Sealed Doc. 154, pgs. 19-20). After all, it "has a long history of introducing new features that displaced formerly dominant products," its "large base of iPhone

users…[could] quickly attract[] millions of U.S. merchants" with the NFC technology, and its charging of lower fees than Defendants Visa and Mastercard still could have resulted in a "handsome profit." (Sealed Doc. 154, pgs. 19-20). Even if the PPAs leave broader facts to be discovered, Plaintiffs argue they contain substantial direct evidence of Defendants' anticompetitive agreement or conspiracy, such as: (1) Defendants' meeting of the minds; (2) Defendants Visa and Mastercard's collection of per-transaction fees from payment-card issuers for payment to Defendant Apple; and (3) Defendants Visa and Mastercard's explicit or implied ability to cease those fee payments to Defendant Apple if it created a competing payment network. (Sealed Doc. 154, pgs. 21-23). In short, Plaintiffs argue the PPAs explicitly show, if Defendant Apple held up its end of the bargain by not creating a competing payment network, then it would retain a contractual right worth hundreds of millions of dollars per year. (Sealed Doc. 154, pgs. 22-23).

Further, in terms of circumstantial evidence of the *per se* unlawful horizontal market allocation agreements, Plaintiffs note Defendants took their unlawful actions at approximately the same time. (Sealed Doc. 154, pgs. 23-24). Defendants Visa and Mastercard allegedly presented the anticompetitive scheme to Defendant Apple, then Defendants reduced that anticompetitive scheme to writing by executing the two PPAs, containing materially similar terms, in August 2014. (Sealed Doc. 154, pg. 24). Plaintiffs also point to various plus factors that are allegedly suggestive of Defendants' coordination in the unlawful agreement or conspiracy, including: Defendant Apple's decision to drop its plan to enter the payment network market and, instead, to accept the market allocation provided by the PPAs; Defendant Apple's above-discussed actions-

against-interest, which "diminish[ed] the value of the iPhone" and represented a deviation from its conduct in other scenarios; Defendants' opportunity to conspire after "extensive discussions to concoct, and to renew in 2017 and 2020, the conspiracy to divide the Relevant Market" in the PPAs; the concentrated nature of the payment network market, which warrants close scrutiny of Defendants' conduct and communications; Defendants' history of anticompetitive conduct, as reflected by other resolved lawsuits; and the pendency of government investigations or lawsuits. (Sealed Doc. 154, pgs. 24-31).

On the issue of antitrust standing, Plaintiffs contend none of Defendant Apple's arguments break the causal chain between Defendants' conduct and Plaintiffs' alleged injury. (Sealed Doc. 154, pg. 31). Despite Defendant Apple's argument that interchange fees are not directly paid by Plaintiffs to Defendants Visa and Mastercard, Plaintiffs argue their contrary allegation must be taken as true at the dismissal stage of the case. (Sealed Doc. 154, pg. 31). Plaintiffs also address Defendant Apple's argument that the inferential causal chain underlying their injury is too speculative and tenuous to support antitrust standing, again stressing that the Amended Class Action Complaint "sets out how Apple was uniquely positioned to enter the market and had taken concrete steps to do so" but ultimately decided instead to enter the PPAs. (Sealed Doc. 154, pg. 33). Finally, in the event the Court grants any portion of Defendants' Motions to Dismiss, Plaintiffs request leave to amend the Amended Class Action Complaint. (Sealed Doc. 154, pgs. 35-36).

Here, by way of reminder, Plaintiffs allege Defendants Visa and Mastercard impose inflated fees for merchants in the United States to use their payment networks. (Doc. 101, pgs. 4, 40-43). Defendant Apple was allegedly positioned to disrupt Defendants

Visa and Mastercard's dominance and to restore competition. (Doc. 101, pgs. 4, 15-20, 31-34). Instead of competing in the relevant market, however, Defendant Apple allegedly agreed with Defendants Visa and Mastercard on a market allocation, whereby Defendant Apple would not establish its own payment network, would prevent Apple Pay users from transferring funds from their bank accounts directly to merchants' bank accounts, and would protect Defendants Visa and Mastercard's payment networks by blocking competitors' access to Apple Wallet and its NFC technology. (Doc. 101, pgs. 4-5, 21-31). In exchange, Defendants allegedly agreed to run Apple Pay transactions through Defendants Visa and Mastercard's payment networks and to pay Defendant Apple a portion of the fees, or "cash bribes," generated by the payment networks. (Doc. 101, pgs. 4-5, 22-31). Plaintiffs were allegedly injured by paying and continuing to pay artificially inflated fees, a portion of which was ultimately received by Defendant Apple, to Defendants Visa and Mastercard for using the payment networks. (Doc. 101, pg. 43).

Plaintiffs specifically allege Defendants' agreements, as described above, constitute *per se* violations of § 1. (Doc. 101, pgs. 5-6, 25, 28, 31, 50). And, as noted above, Defendants have attached their PPAs to the Motions to Dismiss. (Sealed Docs. 116-1, 116-2, 120-1, 120-2). Accordingly, when assessing the sufficiency of the § 1 claim alleged by Plaintiffs in the Amended Class Action Complaint, the Court can consider the terms of the PPAs. *See Kloss*, 462 F. Supp. 3d at 874-76; *Fosnight*, 41 F.4th at 921-22; *Trivedi*, 609 F. Supp. 3d at 631; *Dean*, 46 F.4th at 543; *Esco*, 107 F.4th at 678-79; *Rosenblum*, 299 F.3d at 661.

The Court has independently reviewed the PPAs, including the provisions specifically cited by the parties. (Sealed Docs. 116, pgs. 8 n. 3, 14-17 n. 7, 21-22; 120, pgs.

11, 17-18, 22; 154, pgs. 12-15, 22-23; 157, pgs. 2-6; 159, pgs. 2-4; 163, pg. 2). Based on that review, it appears to the Court that Defendants' arguments are confirmed by the PPAs' express terms—*e.g.*, that Defendants Visa and Mastercard merely bill and collect fees payable to Defendant Apple by payment-card issuers rather than merchant-bank acquirers like Plaintiffs, Defendant Apple reserved the unilateral right to change or suspend any aspect of Apple Pay at any time, Defendant Apple retained the right to launch a competing payment network and Defendants Visa and Mastercard retained the right to suspend aspects of their relationships with Defendant Apple,[6] Defendants were largely unrestricted in their other work and transactions by virtue of the PPAs' non-exclusivity provisions, and the PPAs are silent on bank-to-bank transfers and the access of competitors to Apple Wallet and the NFC technology. (Sealed Docs. 116-1, pgs. 22-24, 32-33, 46, 104; 116-2, pgs. 27, 29-30, 39-40, 42, 73; 120-1, pgs. 22-24, 32-33, 46, 104; 120-2, pgs. 29-30, 39-40, 42, 73). In other words, as alleged, the Court agrees with Defendants that Plaintiffs' allegations of *per se* horizontal market allocation agreements mischaracterize, and are actually contradicted by, the PPAs, which indicate Defendant Apple did not agree to refrain from creating a payment network, to restrict bank-to-bank

---

[6]On the one hand, the PPA between Defendants Visa and Apple indicates, if Defendant Apple creates a payment network, Defendant Visa can suspend its participation in Apple Pay or suspend the entirety of the PPA upon notice to Defendant Apple and a good faith discussion period, the latter of which would cease the obligation of Defendant Visa to provide certain services to payment-card issuers enrolled in Apple Pay. (Sealed Docs. 116-1, pgs. 10-15, 46; 120-1, pgs. 10-15, 46). On the other hand, the PPA between Defendants Mastercard and Apple indicates, if Defendant Apple creates a payment network, Defendant Mastercard can discontinue a limited license granted to Defendant Apple by Defendant Mastercard. (Sealed Docs. 116-2, pgs. 39-40, 42). The limited license would then be unavailable for Defendant Apple's payment network; however, it would remain in effect with respect to the operation and use of Apple Pay. (Sealed Docs. 116-2, pgs. 39-40, 42). Accordingly, Defendant Visa has the option of going farther than Defendant Mastercard in response to Defendant Apple creating a competing payment system.

transfers, or to bar the access of competitors to Apple Wallet and the NFC technology. *See* 15 U.S.C. § 1; *Always Towing & Recovery, Inc.*, 2 F.4th at 703-04; *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 983-88; *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 949; *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d at 1047; *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 788; (Doc. 101, pgs. 4-5, 21-31). The same is true for the allegation that Defendants Visa and Mastercard paid Defendant Apple a portion of the fees, or "cash bribes," received from merchant-bank acquirers, as the PPAs reveal Defendants Visa and Mastercard billed and collected fees payable to Defendant Apple by nondefendant payment-card issuers. (Doc. 101, pgs. 4, 22-31, 40-43). Accordingly, since a comparison of Plaintiffs' direct allegations regarding the PPAs to the actual provisions of those agreements serves only to highlight the implausibility of their § 1 claim, the Court finds Defendants' Motions to Dismiss must be **GRANTED** on this basis. *See Kloss*, 462 F. Supp. 3d at 874-76; *Fosnight*, 41 F.4th at 921-22; *Trivedi*, 609 F. Supp. 3d at 631; *Dean*, 46 F.4th at 543; *Esco*, 107 F.4th at 678-79; *Rosenblum*, 299 F.3d at 661.

Moreover, aside from this finding as to the direct allegations and the express terms of the PPAs, the Court finds Plaintiffs' circumstantial allegations of *per se* horizontal market allocation agreements cannot save their § 1 claim. *See* 15 U.S.C. § 1; *Always Towing & Recovery, Inc.*, 2 F.4th at 703-04; *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 983-85; *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 949; *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d at 1047; *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d at 722. To be sure, Plaintiffs present a slew of circumstantial allegations related to, *inter alia*, Defendants' power and success in their respective markets, a lack of

competition in those markets, Defendant Apple's ability to disrupt and dominate markets, Defendant Apple's attempt to leverage its way into the payment network market, Defendants Visa and Mastercard's fears about Defendant Apple's potential in the payment network market, Defendant Apple's exclusion of PayPal from Apple Pay at Defendants Visa and Mastercard's request, Defendant Apple's willingness to compete with third-parties in other contexts, and the European Commission's findings relative to Defendant Apple's NFC technology. (Doc. 101, pgs. 10-23, 31-43). However, the Court finds those circumstantial allegations are too speculative and conclusory to adequately represent parallel conduct or plus factors that show Defendants violated § 1 by entering *per se* horizontal market allocation agreements. *See Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 712 (E.D. Va. 2019) ("To show an unlawful horizontal agreement between potential competitors, the record must demonstrate that potential competitors had the 'necessary desire, intent, and capability to enter the market.' ").

Instead, the Court is persuaded by Defendant Apple's arguments regarding the speculative and conclusory nature of the allegations that it could succeed in the seemingly monumental task of disintermediating Defendants Visa and Mastercard from the payment network market. As alluded to above, and as reflected by the Amended Class Action Complaint, Plaintiffs premise those allegations, in part, on the dominance of Defendants in their respective markets. At the same time, though, Plaintiffs allege Defendant Apple is so dominant that it should have entered an entirely new market—the payment network market, which is admittedly dominated by, among few others, Defendants Visa and Mastercard—to eventually disintermediate Defendants Visa and

Mastercard and ultimately achieve a greater economic benefit than was possible under the PPAs. This is despite Plaintiffs' own allegation that the PPAs allow Defendant Apple to receive "payments [that] initially amounted to hundreds of millions of dollars each year and are now worth billions of dollars each year." (Doc. 101, pgs. 5, 22).

Plaintiffs may be correct that Defendant Apple, by its nature, was uniquely situated to reap the high potential reward for disintermediating Defendants Visa and Mastercard from the payment network market; however, their allegations completely ignore the difficulties, costs and time, risks, and potential for failure associated with such an endeavor. For example, by generally alleging Defendant Apple should have taken on "the Entrenched Networks" by creating a payment network instead of building "an entirely new product [like Apple Pay]…in the marketplace," Plaintiffs conject that Defendant Apple would be successful in investing in and creating a competing payment network, in launching the competing payment network, in achieving such widespread adoption and market penetration of the competing payment network that it "dethroned" "the Entrenched Networks" by forcing "downward pricing pressure" relative to fees, and in achieving savings that could be passed on to merchants like Plaintiffs. (Sealed Doc. 120, pgs. 6-7, 10, 15, 24-25). And, again, to be a superior economic interest for Defendant Apple, this endeavor would not only have to succeed but also reap a higher reward than the hundreds of millions or billions of dollars received by Defendant Apple under the PPAs. (Doc. 101, pgs. 5, 22). As a result, the Court finds Plaintiffs' circumstantial allegations are too speculative and conclusory to adequately reflect a common motive of Defendants to conspire, to represent parallel acts that are against Defendants' individual

economic self-interests, to reveal other mixtures of parallel behaviors by Defendants, or to indicate details of industry structure and practices. *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 985; *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d at 722. And, notably, Plaintiffs have not alleged any evidence of a high level of interfirm communications. *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 985.

As to the European Commission findings, in particular, the Court notes Plaintiffs allege, "[u]pon information and belief, the conduct challenged by the [European Commission] is part of Apple's unlawful agreements with the Entrenched Networks." (Doc. 101, pg. 37). However, as argued by Defendants and as recognized by the Court, the PPAs are silent on the access of competitors to Apple Wallet and the NFC technology. (Sealed Docs. 116, pgs. 14, 19; 120, pgs. 11, 18). It is again noteworthy, though, that Defendant Apple reserved the unilateral right to change or suspend any aspect of Apple Pay at any time under the PPAs and each Defendant, by virtue of a non-exclusivity provision in those agreements, were largely unrestricted in their other work and transactions with third parties like PayPal. (Docs. 116-1, pgs. 15, 22-23, 104; 116-2, pgs. 27, 29, 73; 120-1, pgs. 15, 22-23, 104; 120-2, pgs. 27, 29, 73). As such, there is no nonspeculative or nonconclusory allegation that Defendants agreed to bar the access of competitors to Apple Wallet and the NFC technology as opposed to Defendant Apple taking that action, if at all, on its own. *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 984; *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 949; *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 760 (1984) (noting a contract, combination, or conspiracy is required for a violation of § 1, meaning "[i]ndependent action is not

28

proscribed"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 n. 27 (1985) ("Under § 1 of the Sherman Act, a business 'generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.' "). In light of the inadequate circumstantial allegations to support a § 1 claim, the Court finds Defendants' Motions to Dismiss must also be **GRANTED** on this basis. *See Kloss*, 462 F. Supp. 3d at 874-76; *Fosnight*, 41 F.4th at 921-22; *Trivedi*, 609 F. Supp. 3d at 631; *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d at 985; *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d at 722.

Alternatively, for reasons similar to those discussed above, the Court finds Plaintiffs lack antitrust standing, such that they cannot bring this action. *See McGarry & McGarry, LLC*, 937 F.3d at 1063-65; *Serfecz*, 67 F.3d at 598. In particular, the Court agrees that Plaintiffs alleged injury is too indirect, remote, and speculative to support antitrust standing. (Sealed Doc. 120, pgs. 7-8, 12-13). That injury is premised on the passing along of inflated fees, set by Defendants Visa and Mastercard and paid by merchant-bank acquirers to payment-card issuers, to merchants by the merchant-bank acquirers, and the sheer possibility that those fees would be lower if Defendant Apple was motivated to create a payment network that disintermediated Defendants Visa and Mastercard instead of building Apple Pay. Therefore, once again, Plaintiffs rely on conjecture related Defendant Apple's ability to perceive greater economic success in that market than the hundreds of millions or billions of dollars that were possible under the PPAs, and to succeed in the difficult task of disrupting and dominating a market in which Defendants Visa and Mastercard had allegedly become "entrenched." As noted above, Defendant Apple would have to succeed in investing in and creating a competing payment network,

in launching the competing payment network, and in achieving such widespread adoption and market penetration of the payment network that it "dethroned" "the Entrenched Networks" by forcing "downward pricing pressure" relative to fees. (Sealed Doc. 120, pgs. 6-7, 10, 15, 24-25). It is only in the event Defendant Apple was successful at each of these steps that it could, without a guarantee, achieve savings for merchants like Plaintiffs by forcing lower fees in the market. For these reasons, the Court finds Plaintiffs failed to state a sufficient link between the alleged antitrust violation and antitrust injury. *See McGarry & McGarry, LLC*, 937 F.3d at 1063-65; *Serfecz*, 67 F.3d at 598. As such, on this alternate basis, the Court concludes Defendants' Motions to Dismiss must be **GRANTED**.

### III. CONCLUSION

As explained above, the Motions to Dismiss are **GRANTED in part** and **DENIED in part**. The Amended Class Action Complaint is **DISMISSED without prejudice**. As requested, Plaintiffs shall file a Second Amended Class Action Complaint, if any, within 30 days. *See* Fed. R. Civ. P. 15(a)(2); *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Nw. Indiana*, 786 F.3d 510, 519-20 (7th Cir. 2015); *G.T. v. Samsung Elec. Am. Inc.*, 742 F. Supp. 3d 788, 801-02 (N.D. Ill. 2024). Failing to timely file a Second Amended Class Action Complaint will result in a dismissal of the case under Federal Rule of Civil Procedure 41(b). *See* Fed. R. Civ. P. 41(b); *James v. McDonald's Corp.*, 417 F.3d 672, 681 (7th Cir. 2005).

**SO ORDERED**.

Dated: July 9, 2025

s/ *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge